**2014-1214**

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

FLEXITEEK AMERICAS, INC., A FLORIDA CORPORATION,
FLEXITEEK INTERNATIONAL AS, A FOREIGN CORPORATION,

Plaintiffs-Appellants,

v.

PLASTEAK, INC., AN OHIO CORPORATION
PLASDECK, INC., AN OHIO CORPORATION,

Defendants-Appellees

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF FLORIDA IN CASE NO. 12-CV-60215, JUDGE PATRICIA A. SEITZ.

_____

## CORRECTED BRIEF OF PLAINTIFFS-APPELLANTS
## FLEXITEEK AMERICAS, INC. AND FLEXITEEK INTERNATIONAL AS

_____

| May 20, 2014 | Scott D. Smiley |
| | Florida Bar No. 678341 |
| | THE CONCEPT LAW GROUP, P.A. |
| | 200 S Andrews Avenue, Suite 100 |
| | Fort Lauderdale, Florida 33301 |
| | (754) 300-1500 |
| | ATTORNEY FOR PLAINTIFF-APPELLANTS, FLEXITEEK AMERICAS, INC. and FLEXITEEK INTERNATIONAL AS |

i

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**FLEXITEEK AMERICAS, INC. v. PLASTEAK, INC.**

## No. 2014-1214

### CERTIFICATE OF INTEREST

Counsel for <u>Appellants</u> certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

<u>FLEXITEEK AMERICAS, INC. AND FLEXITEEK INTERNATIONAL AS     </u>

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

<u>N/A                                                                                                      </u>

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

<u>Watrium AS; FLEXITEEK AMERICAS, INC. is a 100% wholly owned subsidiary of FLEXITEEK INTERNATIONAL AS                                          </u>

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

<u>THE CONCEPT LAW GROUP, P.A.; SANTUCCI PRIORE, P.L.; Michael I. Santucci; Joseph V. Priore; Daniel Devine; Scott D. Smiley, and Mark Johnson</u>


<u>5/20/14          </u>                    <u>/Scott D. Smiley/      </u>
Date                                    Scott D. Smiley, Esq.

# **Table of Contents**

TABLE OF AUTHORITIES ....................................................................................v

STATEMENT OF RELATED CASES ................................................................ vii

STATEMENT OF JURISDICTION........................................................................1

STATEMENT OF THE ISSUES.............................................................................1

STATEMENT OF THE CASE.................................................................................2

STATEMENT OF RELEVANT FACTS .................................................................4

SUMMARY OF ARGUMENT ...............................................................................8

STANDARD OF REVIEW ...................................................................................10

ARGUMENT AND AUTHORITIES....................................................................11

    I.   The District Court Erred by Viewing an Actual Commercial Embodiment of Plaintiffs' Product and then Importing Features of that Physical Product Into the Construction of the Term "Longitudinal Slots," a Limitation Found Within the Claims of the '881 Patent.................................................................................................11

        A.   The district court's viewing of the commercial embodiment of Appellants' product before claims construction was irrelevant extrinsic evidence, prejudiced Appellants, and constitutes reversible error. ...................11

        B.   Utilizing Appellants' commercial product to define the claim terms of the '881 Patent violated Appellants' Fifth Amendment rights. .............................15

        C.  Reading in limitations from the commercial embodiment of Appellants' product was contrary to the intrinsic evidence of the '881 Patent and constitutes reversible error...............................................................................17

    II. The District Court Erred by Comparing Features of an Actual Commercial Embodiment of Defendants' Product to Features of an Actual Commercial Embodiment of Plaintiffs' Product at the June 6, 2013, Technology Conference that Occurred before Claims Construction of the '881 Patent. ............................28

    III.  The District Court Erred by Finding No Genuine Issue of Material Fact with Regard to Whether the Recesses Found on Side Edges of a Single Plank of

Defendants' Products were not "Relatively Close Together," when the Claim Recites the Plural "Planks." .................................................................... 30

IV. The District Court Erred by Finding "Plaintiffs are Estopped from Claiming Equivalence" with Regard to Microstructural Recesses. .................................... 33

CONCLUSION ..................................................................................... 38

ATTORNEYS FOR PLAINTIFFS-APPELLANTS ............................................. 43

# <u>TABLE OF AUTHORITIES</u>

## Cases

Allen v. Tyson Foods, 121 F.3d 642 (11th Cir. 1997) ................................................... 30

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................... 11, 30-31

Bolling v. Sharpe, 347 U.S. 497 (1954) ...................................................................... 16

Callicrate v. Wadsworth Mfg., 427 F.3d 1361 (Fed. Cir. 2005) ............................. 22-23

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .......................................................... 11

ComScore, Inc. v. Integral Ad Sci., Inc., 924 F. Supp. 2d 677 (E.D. Va. Feb. 14, 2013) ........... 16

Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374 (Fed. Cir. 2006) ................ 27

Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973 (Fed. Cir. 1999) ......................... 27, 38

Engquist v. Or. Dep't of Agric., 553 U.S. 591 (2008) ................................................ 16

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722 (2002) .......... 33-35

Fitzpatrick v. City of Atlanta, 2 F.3d 1112 (11th Cir. 1993) ................................. 11, 30

F.S. Royster Guano Co. v. Virginia, 253 U.S. 412 (1920) ......................................... 16

Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352 (Fed. Cir. 2004) ............... 11

Hunt v. Cromartie, 546 U.S. 541 (1999) .................................................................... 30

Int'l Visual Corp. v. Crown Metal Co., 991 F.2d 768 (Fed. Cir. 1993) ...................... 13

Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050 (Fed. Cir. 1989) ............... 35

Kapusta v. Gale Corp., 155 Fed. Appx. 518 (Fed. Cir. 2005) ................................... 23

Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968 (Fed. Cir. 1999) .......... 23

Landmark Screens, LLC v. Morgan, Lewis, & Bockius, LLP, 676 F.3d 1354 (Fed. Cir. 2012)   10

Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp., 744 F.3d 1272 (Fed. Cir. 2014) (en banc) ................................................................................................................ 10

Luhn v. Scott, No. A-04-CA-521-LY, 2006 U.S. Dist. LEXIS 100617, at 13 (W.D. Tex. May 26, 2006) ...................................................................................................................... 13

Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc) ................ 27

Omega Eng'g, Inc. v. Raytek, Corp., 334 F.3d 1314 (Fed. Cir. 2003) ................... 26, 35

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......... 11-12, 14, 17-20, 23, 25

Plyer v. Doe, 457 U.S. 202 (1982) ............................................................................. 15

Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294 (Fed. Cir. 1999) ...................... 13

Shelley v. Kraemer, 334 U.S. 1 (1948) ...................................................................... 16

SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331 (Fed. Cir. 2005) .......... 13

Southwall Tech. v. Cardinal IG Co., 54 F.3d 1570 (Fed. Cir. 1995) ......................... 36

SRI Int'l v. Matsushita Electric Corp. of Am., 775 F.2d 1107 (Fed. Cir. 1985) (en banc) .... 28-29

St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc., 412 Fed. Appx. 270, 276 (Fed. Cir. 2011) .................................................................................................................................... 24

Unique Functional Prods., Inc. v. Mastercraft Boat Co., Inc., 82 Fed. Appx. 683, 689 (Fed. Cir. 2003) .................................................................................................................................... 13

Univ. of Colo. Found. v. Am. Cyanamid Co., 196 F.3d 1366 (Fed. Cir. 1999) .......................... 17

Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322 (Fed. Cir. 2006) ... 28-29

WSB-TV v. Lee, 842 F.2d 1266 (11th Cir. 1988) .......................................................................... 31

Zenith Labs., Inc. v. Bristol-Meyers Squibb Co., 19 F. 3d 1418 (Fed Cir. 1994) ....................... 14

## Statutes

28 U.S.C. § 1295(a) ........................................................................................................................ 1

28 U.S.C. §§ 1331 and 1338(a) ...................................................................................................... 1

28 U.S.C. § 2107 ............................................................................................................................. 1

35 U.S.C. § 1 ................................................................................................................................... 1

## Other

157 Cong. Rec. S5402, 5427, 5432 (daily ed. Sep. 8, 2011) ...................................................... 15

Fed. R. App. P. 4(a) ........................................................................................................................ 1

Fed. R. App. P. 32(a)(5) ............................................................................................................... 43

Fed. R. App. P. 32(a)(6) ............................................................................................................... 43

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................................................................... 43

Fed. R. Civ. P. 56 .......................................................................................................................... 11

U.S. Const. art. I, § 8, cl. 8 ........................................................................................................... 15

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the district court was previously before this or another appellate court.  This Court's decision in this case may affect *Flexiteek Americas Inc., et al. v. Tek-Dek, Ltd., et al.* (S.D. Fla. filed June 30, 2008) case no. 08-CV-60995, a case involving infringement of the same patent but with different defendants.

## STATEMENT OF JURISDICTION

This case was originally an action for patent infringement arising under the Patent Act of 1952 and amendments, 35 U.S.C. § 1 *et seq*. The district court had jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). The U.S. Court of Appeals for the Federal Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a).

In accordance with Fed. Cir. R. 28(a)(5), counsel for Plaintiffs-Appellants, FLEXITEEK AMERICAS, INC. and FLEXITEEK INTERTATIONAL AS (hereinafter "Appellants" and/or "Plaintiffs") represents that the order appealed from in this case is a final appealable order. This appeal was timely filed in accordance with 28 U.S.C. § 2107 and Fed. R. App. P. 4(a). More specifically, the instant appeal was filed following the entry of the district court's Final Judgment (DE 256) on December 3, 2013.

## STATEMENT OF THE ISSUES

1. Did the District Court err in viewing an actual commercial embodiment of Plaintiffs' product and importing features of that physical product into the construction of the term "longitudinal slots," a limitation found within the claims of U.S. Patent 6,895,881?

2. Did the District Court err in comparing features of an actual commercial embodiment of Defendants' product to features of an actual commercial

1

embodiment of Plaintiffs' product at a June 6, 2013, technology conference that occurred before, and in aid of, claims construction?

3. Did the District Court err in finding no genuine issue of material fact that the recesses found on side edges of a single plank of Defendants' products were not "relatively close together," when the claim recites the plural "planks?"

4. Did the District Court err by finding "Plaintiffs are estopped from claiming equivalence" with regard to microstructural recesses?

## STATEMENT OF THE CASE

Appellants are the owner of U.S. Patent 6,895,881 (hereinafter "the '881 Patent"), which relates to an invention concerning synthetic flooring products principally used on marine vessels. *See* (A97). Appellants successfully obtained a jury verdict of patent infringement of claim 1 of the '881 Patent that was appealed by Defendants-Appellees, PLASTEAK, INC. and PLASDECK, INC. (hereinafter "Appellees" and/or "Defendants") and affirmed by the Federal Circuit (hereinafter "*Flexiteek I*"). (A98). After affirmance, the United States Patent and Trademark Office ("USPTO"), acting on a granted petition for *ex parte* reexamination by the Appellees, invalidated claim 1 of the '881 Patent and issued a reexamination certificate with new claims 2-29.[1] *Id.* The Appellees moved for relief from the

---

[1] New claims 2-8 continue to depend from cancelled claim 1.

2

Final Judgment in light of cancelled claim 1 and the district court granted the same. *See* (A100).

Thereafter, Appellants filed a second suit against the Appellees (hereinafter "*Flexiteek II*") alleging patent infringement of the reissued '881 Patent and for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"). *See* (A103–05). Both Appellants and Appellees (collectively the "Parties") fully briefed their positions on the proposed interpretation the district court should take on the reissued claims of the '881 Patent. *See* (A190–211, A311–33). The district court struck the Parties' briefs, ordered the Parties submit a joint statement of claims construction, and set a technology tutorial hearing for "the parties [to] discuss their technology (with samples)," the prior art, and the prosecution history of the '881 Patent. (A1962-63) Appellants strenuously objected to the introduction and use of Appellants' commercial products and Appellees' accused products to define the terms of the claims. (A1963).

After the technology tutorial hearing, the Parties submitted a supplemental joint claim construction statement and the district court issued its Order on claims construction. (A1965–87). The Appellees moved for summary judgment of non-infringement and failure to prove damages under FDUPTA, which the district court granted. (A39–50). This ruling and the claims construction on which it was based, are now being appealed.

## STATEMENT OF RELEVANT FACTS

The '881 Patent summarizes the invention described therein as:

> [A] shape conforming surface covering useful for covering a floor surface, a wall surface, a boat or yacht deck, floor boards in boats and yachts, bath and shower room floors and walls coverings, is swimming pool surroundings, curved floor plans inside and outside buildings, claddings and coverings of many other types of surface recipients, including decoration. The surface covering according to the invention is formed by strips of an flexible material and is adapted for being laid in slightly curved formation where necessary, and it is generally intended to imitate a type of deck made by teak, mahogany, oregon pine etc. and which is sometimes formed with narrow seams by a rubber type material, which is normally of a contrasting colour, often black.

(A285, at col. 1, lines 12-25).

The '881 Patent describes a synthetic flooring product that resembles wood

and originally issued with 1 independent claim reciting:

> A shape conforming surface covering useful for covering any type of surfaces, characterized in that the surface covering comprises planks or sheet of a flexible material adapted to be interconnected aside of each other thereby forming an assembled surface covering of optional length and width, and which planks are of a material that can be laid in curved formations, and which at the upper surface of the covering is roughened so as to imitate any unique grain effect of wooden material, further characterized in that the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient.

(A287).

In *Flexiteek I*, the district court defined "longitudinal slots" as:

> [R]ecesses that run the length of the planks or sheets, without limitation of the size or shape of the recesses which both (1) facilitate curving and (2) form a surface connection by means of glue or adhesive material to a surface being covered.

(A309).

On June 19, 2009, a jury found that the Appellees literally infringed each element of the '881 Patent. (A97). After Final Judgment was issued, Appellees sought, and had granted, an *ex parte* reexamination proceeding at the USPTO based on multiple references, specifically U.S. Patent 4,290,248 (hereinafter "Kemerer"). (A98). During the reexamination proceeding, a panel of three patent examiners, similar to the district court in *Flexiteek I*, found that the term "longitudinal slots" was met by recesses that inherently facilitates in the formation of a curvature and are capable of serving as a base for adhesive. (A234). Specifically, the examiners stated that:

> Claim 1 broadly recites planks formed with longitudinal slots at the underside thereof "for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient." **This broad, functional language is met by *any structure* that is capable of performing the recited functions of facilitating the formation of curved coverings and acting as a base for glue/adhesive**.

(A236, A253) (emphasis added).

The Board of Patent Appeals and Interferences ("BPAI") affirmed the examiners' rationale and interpretation. (A3579).

As a result of such a broad definition of the term "longitudinal slots" being assigned to claim 1 in the reexamination proceeding, claim 1 was invalidated based on Kemerer and 28 new claims—claims 2-29—were added and reissued. (A214–16). The allowability of the new claims was based upon the prior art's failure to "teach a plank capable of being laid in a tightly curved formation, with the plank being secured only with adhesive, without the use of additional fasteners." (A220, A276). Claim 2, which depends on, and includes all limitations of, claim 1 recites:

> The shape conforming surface covering of claim 1, wherein the planks or sheet are mounted on the surface recipient in a tightly curved formation only with adhesive and without use of additional fasteners.

(A214).

Thereafter, in *Flexiteek II*, Appellants filed suit against Appellees alleging patent infringement of the reissued '881 Patent. (A95–107). The Parties believed the claim terms genuinely disputed were "longitudinal slots," "tightly curved," and "interconnected." (A1966). Both Parties submitted *Markman* briefs, with Appellee including pictures of the front and back surfaces of its products before the district court construed the disputed claim terms. *See* (A1653). The district court, *sua sponte*, struck the Parties' *Markman* briefs and ordered a "technology tutorial," where the Parties were required to bring with them Appellees' accused products and Appellants' commercial product, to discuss the claimed invention, take questions from the judge, and present arguments as to appropriate definitions of the

disputed claim terms. (A1962–63). Appellees, in connection with the technology tutorial hearing, prepared and filed with the court demonstrative aids that also included detailed front and back surface views of both Appellees' and Appellants' products. (A2053-2057, A2066-2069, A2073-2092). The Parties were also ordered to provide all intrinsic evidence of the '881 Patent to the district court. (A1962-63). Appellants voiced their objection twice before the district court received both Appellants' and Appellees' product samples. (A1936-40, A4202). Notwithstanding, during the technology tutorial hearing, the district court requested Appellants produce the commercial embodiment of its product and, after review of said material and Appellees' accused product, asked the Appellees "how did you lose this case? [referring to *Flexiteek I*]". (A4212, A4262).

Appellants maintained their objections to the district court viewing products, but did not request that the district court hold a *Markman* hearing because the extensive three hour and fifty minute "technology tutorial" was the legal equivalent of a *Markman* hearing. (A2124). After the "technology tutorial" hearing, the district court defined the term "longitudinal slots" differently than it was defined by the district court in *Flexiteek I*, differently than it was defined by the three patent examiners in the reexamination, and differently than the definition affirmed by the BPAI. The district court in *Flexiteek II* defined "longitudinal slots" as:

> Grooves spaces relatively close together that run parallel to each other for the length of the planks or sheet, wherein the grooves have a depth

and width of a material percentage of the planks' or sheets' thickness such that the grooves materially increase the ability to curve and the surface area for adhesion.

(A6).

Appellees' moved for summary judgment of noninfringement, which was based on, according to the district court, "whether, based on the record evidence, a rational trier of fact could find that there are longitudinal slots on the underside of the accused devices." (A55, A2554-71). Appellees' admittedly have at least ten different product lines that are applicable to the infringement proceeding in *Flexiteek II*. (A2874-75, A4108-09). Based on the district court's interpretation, Appellants alleged four bases of finding "longitudinal slots" within Appellees' products. (A3083-88). The district court found noninfringement as to all of Appellants' products, noting, particularly with respect to the recesses on the side edges, that "a reasonable juror could not find these recesses are spaced 'relatively close together.'" (A59).

## SUMMARY OF ARGUMENT

Appellants assert that the district court erred by requiring the Appellants provide the court with samples of Appellants' commercial embodiment of its product before claims construction and, after receiving those samples, incorporating features found in said product into the term "longitudinal slots." The district court's methodology was contrary to patent law precedent and also against

8

public policy of spurring innovation and creating a more complete disclosure. The district court also required and viewed Appellees' products before claim construction. Partly because the district court viewed both Parties' products, more specifically with regard to Appellants' products, it is also submitted that the district court erred by construing the term "longitudinal slots" contrary to the overwhelming intrinsic evidence supporting a broader interpretation, including a clear and public definition of said term delineated by three examiners in a reexamination proceeding and on appeal at the BPAI[2]. The broader definition was also mimicked by the district court in *Flexiteek I*.

Appellants also assert that the district court treated Appellants, who are practicing entities with regard to their patented product, differently than non-practicing entities by requiring Appellants produce their products before claim construction. Said another way, non-practicing entities would not have been required to produce any products to the district court, as opposed to the Appellants who were, and that exaggerated features of said products tainted the view of the Judge as to what certain claim terms mean. Appellants submit the district court violated the equal protection principles found within the 5th Amendment of the United States Constitution by penalizing Appellants—a practicing entity—without any reasonable or rational basis for doing so.

---

[2] Now the Patent Trial and Appeal Board ("PTAB").

Appellants also assert the district court erred by comparing features between the Parties' products at the "technology tutorial" hearing and then, before claim construction, engaging in an impromptu infringement analysis that prejudiced the Appellants. More specifically, the district court was prompted to ask Appellees "how did you lose this case [referring to *Flexiteek I*]," and Appellants argue that this line of questioning and the viewing of the Parties' products evidences a process wherein the district court construed the term "longitudinal slots" to exclude Appellees' products. Further, Appellants also argue that a jury should decide genuine issues of material fact that exist in this case with regard to the spacing and sizing of slots found on Appellees products. Lastly, Appellants argue that the district court erred in foreclosing the application of the doctrine of equivalents with regard to microstructural slots found on Appellees' products and that this issue should be decided by a jury, rather than the district court.

## STANDARD OF REVIEW

Claim construction is an issue of law and the Federal Circuit's review of a district court's order construing patent claims is *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276–1284 (Fed. Cir. 2014) (en banc). A district court's grant of summary judgment is reviewed by the Federal Circuit under the law of the regional circuit, here, the Eleventh Circuit. *Landmark Screens, LLC v. Morgan, Lewis, & Bockius, LLP*, 676 F.3d 1354, 1361

(Fed. Cir. 2012). The Eleventh Circuit reviews a district court's grant of summary judgment *de novo*. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In reviewing a district court's grant of summary judgment, the Federal Circuit views the facts in the light most favorable to the losing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT AND AUTHORITIES

I. **The District Court Erred by Viewing an Actual Commercial Embodiment of Plaintiffs' Product and then Importing Features of that Physical Product Into the Construction of the Term "Longitudinal Slots," a Limitation Found Within the Claims of the '881 Patent.**

  A. The district court's viewing of the commercial embodiment of Appellants' product before claims construction was irrelevant extrinsic evidence, prejudiced Appellants, and constitutes <u>reversible error</u>.

It is axiomatic that in the hierarchy of sources used to construe a patent claim term, extrinsic evidence is the least significant. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc). Fundamentally, the court's inquiry into the meaning of a claim is what a person of ordinary skill would have understood the words of the claim to mean "*at the time of the invention.*" *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1355–56 (Fed. Cir. 2004)

(emphasis added). Extrinsic evidence created *after* the invention is of little value, if any. *See Phillips*, 415 F.3d at 1318. This is because "extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Id.*

Over Appellants' repeated objections, Appellants were not only asked, but were *required* to bring samples of its products to the "technology tutorial"[3] hearing.[4] *See* (A1962-63, A4212). The district court physically inspected Appellants' product. *See, e.g.*, (A4339, at 27:00–27:45). The court then assigned a definition to the claim term "longitudinal slots" that is substantially narrower than the definition assigned by the district court in *Flexiteek I*—a definition that was affirmed by the three patent examiners at the USPTO during reexamination and the BPAI during the reexamination appeal. *See* (A236, A253, A309, A3579); *see infra* Section II(C). The product viewed by the district court was manufactured with exaggerated features that Appellant maintained throughout the case were not required by the claims of the '881 Patent. *See, e.g.*, (A1969).

---

[3] The "technology tutorial hearing" was legally and procedurally equivalent to a formal *Markman* hearing. *See* (A2124).

[4] Before the district court rendered its claim construction order, Appellees also produced detailed photos that depicted the front and back surfaces of commercial embodiments of Appellants' products. *See, e.g.*, (A2074).

This Court's precedent has made it manifestly clear that interpreting claims, much less determining infringement, with reference to a commercial embodiment of a plaintiff's product, is reversible error. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005) (rejecting claim interpretation based on commercial embodiment or commercial application of invention); *Int'l Visual Corp. v. Crown Metal Co.*, 991 F.2d 768, 771–72 (Fed. Cir. 1993) (reversing a district court's claim construction because limitations from the plaintiff's commercial embodiment were read into the claims, stating "infringement is determined on the basis of the claims, not on the basis of a comparison with the patentee's commercial embodiment of the claimed invention"); *see also Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1303 (Fed. Cir. 1999) ("[T]he district court erred by importing the functions of a working device into these specific claims, rather than reading the claims for their meaning independent of any working embodiment"); *Unique Functional Prods., Inc. v. Mastercraft Boat Co., Inc.*, 82 Fed. Appx. 683, 689 (Fed. Cir. 2003) ("We agree . . . that the district court erred in its construction of the claim of the '777 patent by neglecting certain features shown in the patent and instead including certain features of [Plaintiff's] commercial embodiment. . . . It is of no consequence that those extraneous features are present in [Plaintiff's] commercial embodiment."); *Luhn v. Scott*, No. A-04-CA-521-LY, 2006 U.S. Dist. LEXIS

100617, at 13 (W.D. Tex. May 26, 2006) (holding that the consideration of patentee's commercial embodiment for claim "construction improperly relies on extrinsic evidence of a kind not approved by the Federal Circuit") (citing to *Zenith Labs., Inc. v. Bristol-Meyers Squibb Co.*, 19 F. 3d 1418, 1423 (Fed Cir. 1994)).

This Court has previously emphasized the unreliability of extrinsic evidence due to its creation outside of the prosecution of a patent and because a court should only construe claims as they would be understood by a person of skill in the art "at the time of invention." *Phillips*, 415 F.3d at 1313, 1318 (emphasis added). This Court has warned that viewing extrinsic evidence presents the risk of a court changing the scope of a claim term that is clear from the intrinsic record. *Id.* at 1319.

The reasons for concern articulated in *Phillips* have now materialized in the case *sub judice*. The district court's viewing of unreliable extrinsic evidence resulted in a claim construction of the term "longitudinal slots" that has deviated from the clear public record definition of said term, thereby significantly prejudicing Appellants and creating the potential for a dangerous precedent.

Permitting courts to define claim terms with consideration of the commercial embodiment of a patentee's product is likely to promote an undesirable and prejudicial litigation strategy for accused infringers to scour through all products of a patentee, looking for the most self-serving product configuration that differs the

most from the accused product. Besides the obvious potential to mislead a court, resulting in an improper claim construction, this precedent would also prejudice those patentees who commercially exploit their inventions. More specifically, patentees would be motivated to only produce—and describe in patent applications in accordance with the statutorily required "best mode"—if at all, products that conform to the broadest reading of their claims, rather than all different types of products that would otherwise promote and increase innovation. Appellants submit that setting such a precedent would be in contravention to the Patent Act's policy of spurring innovation and creating a more complete disclosure. *See, e.g.*, 157 Cong. Rec. S5402, 5427, 5432 (daily ed. Sep. 8, 2011) (statements of Sen. Kyl and Sen. Kirk) (discussing the policy of the Patent Act to spur innovation to promote and encourage full invention disclosures).

Therefore, precedent, public policy, and notions of fairness and justice support this Court finding that the district court erred in viewing a commercial embodiment of Appellants' product before claims construction.

B.     Utilizing Appellants' commercial product to define the claim terms of the '881 Patent violated Appellants' Fifth Amendment rights.

The United States Constitution secures "to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly circumstanced shall be treated alike." *Plyer v. Doe*, 457 U.S.

15

202, 216 (1982) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Although this clause applies only to state governments, actions by the federal government that treat individuals in a discriminatory manner will, under similar circumstances, violate the due process of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). Judicial actions are also covered under the purview of the Equal Protection Clause. *See, e.g.*, *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948). Therefore,

> [w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and conditions. Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a rational basis for the difference in treatment.

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (quotations omitted) (emphasis added).

In the case at bar, Appellants have not been treated similarly to other patent holders. Specifically, there is no requirement that a patent holder make, use, or sell the patented invention. *See ComScore, Inc. v. Integral Ad Sci., Inc.*, 924 F. Supp. 2d 677, 683 (E.D. Va. Feb. 14, 2013) ("plaintiff was a 'non-practicing entity,' who did 'not research and develop new technology but rather acquire[d] patents, license[d] the technology, and sue[d] alleged infringers'"). As discussed above, over Appellants' objections, Appellants were not only asked, but were required to

16

bring samples of its products to the "technology tutorial." Had Appellants been a non-practicing entity, it would have been impossible for the district court to force it to bring its products into court. It then follows that, had Appellants been a non-practicing entity, the district court could not have considered and inserted the exaggerated and extraneous features of the commercial embodiment of its product when determining the definition to apply to claim terms. As such, Appellants submit that they, as practicing entities, have been arbitrarily singled out without any rational basis for difference in treatment over a non-practicing entity.

The district court's claim definitions were biased with improper prejudicial extrinsic evidence and must be set aside. Appellants request for this Court to provide guidance to the lower courts that will ensure all similarly situated patent holders are treated similarly. *See Univ. of Colo. Found. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1372 (Fed. Cir. 1999) (discussing the federal objective of "supplying uniform national patent law standards").

C. Reading in limitations from the commercial embodiment of Appellants' product was contrary to the intrinsic evidence of the '881 <u>Patent and constitutes reversible error.</u>

Whether or not a court considers extrinsic evidence, the same should never be used to "change the meaning of claims in derogation of the [intrinsic evidence], thereby undermining the public notice function of patents." *Phillips*, 415 F.3d at 1319. "Because a patentee is required to define precisely what his or her invention

is . . . it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id.* at 1312. The district court committed error by interpreting the term "longitudinal slots" inconsistent with the overwhelming intrinsic evidence by reading in physical features found in one of Appellants' products. Based on the intrinsic evidence, the term "longitudinal slots" should be defined as "recesses that run in the lengthwise direction of the planks or sheet, without limitation of the size and shape of the recesses, which both (1) facilitate curving and (2) form a surface connection by means of glue or adhesive material to a surface being covered." *See* (A204).

When construing claims, the intrinsic evidence is the primary resource. *See Phillips*, 415 F.3d at 1312. Claim terms are "generally given their ordinary and customary meaning," i.e., the meaning that the term would have to "a person of ordinary skill in the art . . . at the time of the invention." *Id.* at 1312–13 (internal citations omitted) (emphasis added). The district court erred by including the following extraneous limitations found in Appellants' products into the claims: (1) "grooves spaced relatively close together," (2) "run parallel to each other for the length of the planks or sheet," (3) "groves have a depth and width of a material percentage of the planks' or sheets' thickness," and (4) "such that grooves materially increase the ability to curve and the surface area for adhesion." *See* (A6).

The language from the claims of the '881 Patent support Appellants' proposed definition above. *See Phillips*, 415 F.3d 1303, at 1314 ("Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms."). For example, claim 1[5] only includes the adjective "longitudinal" before the word "slot," without any other modifier except that the slots must perform two functions. (A287). More specifically, the "slot" must "facilitat[e] forming of curved covering" and "act[] as a base for glue or adhesive material by means of which the surface covering is mounted on a surface recipient."[6] *Id.* Noticeably absent is any claim language that limits the slots to a particular shape, size, configuration, or length of said slot. *See id.* Furthermore, a comparison between claims 1 and 3 supports a construction that does not require more than one slot per plank, much less that the slots be "spaced relatively close together." *Compare id.* (claim 1 requiring the planks be formed "with longitudinal slots") *with* (A214) (claim 3 requiring the planks be formed "with a plurality of longitudinal slots") (emphasis added); (A6); *see also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("claim differentiation takes on relevance in the context of a claim

---

[5] Claim 1 is incorporated by reference into claims 2-8. (A214).

[6] Similar to previous constructions in *Flexiteek I* and the BPAI, during the technology tutorial hearing the district court also appeared to acknowledge that the term "longitudinal slots" only required the slots to facilitate in forming of a curved covering and acting as a base for adhesive, without anything more. (A4243).

construction that would render additional, or different, language in another independent claim superfluous").

The word "longitudinal" should receive its plain and ordinary meaning to one of skill in the art, i.e., "the lengthwise direction" in relation to the planks or sheet. *Phillips*, 415 F.3d at 1312–13. The term "slot" is used in the claims and specification in accordance with its plain and ordinary meaning, i.e., a "recess." *See, e.g.*, (A286, at col. 3, lines 25–30, 61).

Appellants' proposed definition is also consistent with the manner in which the term "longitudinal slots" is used in the specification. *See Phillips*, 415 F.3d at 1315 (approving the specification as the single best guide to interpreting claims). More specifically, with reference to FIG. 3 of the '881 Patent:

> The under-side of the plank can be formed with a number of recesses 6, which both facilitate a curving of the plank, as illustrated in FIG. 3, and form a connection means for glue or a similar material by means of which the surface covering is glue connected to surface covering recipient 7.

(A285, at Col. 3, lines 25–30).



Fig. 3

Also absent from the text of the specification is any mention of the specific size, spacing, or quantity of the "slots."[7] *See* (A285–87).  The specification goes on to state that "under surface recesses 6 <u>can be</u> formed in <u>endless lengths</u> by <u>any</u> known process." (A286, at col. 3, lines 61–62) (emphasis added).  This sentence shows that the patentee contemplated an endless variety of different sized lengths. *See id.*  Appellants recognize that, upon first blush, "endless" appears susceptible to a second interpretation—"continuous and never ending."  A conclusion that the slots do not end, however, is nonsensical, as the claimed product is a plank or sheet of flexible material that, obviously, must be provided in a defined, i.e., non-infinite, length.  But even if "endless" meant "without ending," the phrase "can be" is non-exclusive, i.e., "can be" does not mean "must be," and announces just one of at least two options.

In the final mention of "recesses" in the specification, with reference to FIG. 6 below, the '881 Patent provides: "FIG. 6 shows a cross section of an extruded plank, in which there are shown, for <u>illustrative purposes</u>, several types of bottom surface recesses." *Id.* at col. 4, lines 41–43.  Once again, there is no specific size or limitation mentioned in the text of the specification.  FIG. 6 shows multiple shapes in which the recesses can be formed, but does not require/limit the invention to any of these.

---

[7] Also acknowledged by the district court.  (A3).

21



Fig. 6

Fig. 11

Similar to FIG. 11 of the instant application, shown above, which depicts slots with no appreciable depth and width, and FIGS. 2-4, which do not depict any visual depth and width of the recesses, FIG. 6, like FIG. 1, is simply one of many embodiments of the recesses. *See* (A285–87). In fact, further review of the specification reveals that the slots/recesses similar to those shown in FIG. 6 are for a purpose <u>other than</u> simply "facilitating forming of curved coverings and for acting as a base for a glue or adhesive material," as is recited in claim 1. More specifically, the specification states:

> FIG. 6 illustrates different types of useful under side surface profiles. The cross sections of the various profiles can also include provision for insertion of rigid or injected foam of lighter material <u>to reduce the overall weight, and/or for insulating purposes</u>.

(A286, at col. 3, lines 55–59).

Therefore, the "slots" recited within the claims of the '881 Patent should not be restricted to the exaggerated weight-reducing/insulating recesses shown in FIG. 6, just like they should not be restricted to the visibly undetectable slots shown in FIG. 11. *See Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005).

The district court incorporated spacing and length limitations into the term "slots" principally because FIGS. 1, 6, and 11 depict recesses in a parallel fashion. (A3). However, FIGS. 2, 3, and 4 depict embodiments of the planks with no appreciable size or spacing of any "slots" and that the figures are merely offered as "examples." (A281–84, A285, at col. 2, line 54). As such, reading only one of many exemplary embodiments shown in the patent figures into the claims was improper. *See Phillips*, 415 F.3d at 1312, 1323; *see also Kapusta v. Gale Corp., 155 Fed. Appx. 518, 522 (Fed. Cir. 2005)* (reversing a claim construction ruling partly based on the improper incorporation of limitations found in certain figures, but not others); *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir. 1999) ("The general rule, of course, is that the claims of a patent are not limited to the preferred embodiment, unless by their own language").

The original and reexamination prosecution of the '881 Patent also do not support incorporating a size or spacing limitation for the "slots." *See* (A364–555, A561–1613). In the original examination history, there is no mention of limiting the size or spacing of the slots. *See* (A364). During the reexamination of the '881 Patent, three examiners stated with regard to the term "slots":

> This broad, functional language is met by any structure that is capable of performing the recited functions of facilitating the formation of curved coverings and acting as a base for glue/adhesive.
> . . .
> The fact that the slots [in the Kemerer reference] are "large" is immaterial since the claims do not define the relative size of the slots.

23

(A236); *see also* (A253).

As this Court has previously reasoned, an examiner's evaluation of the claims and prior art can provide persuasive intrinsic evidence as examiners are generally unbiased persons of skill in the relevant art. *See St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, 412 Fed. Appx. 270, 276 (Fed. Cir. 2011) (using the examiner's statement in reexamination to narrow a patentee's construction "[b]ecause an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight"). In the present case, the examiners' broad construction of the term "longitudinal slots" resulted in a clear public record that not only reinforced the district court's construction of the same in *Flexiteek I*, but also was buttressed, again, by three administrative judges at the BPAI on appeal. *See* (A3579) ("Appellants' claim 1 does not recite specific dimensions of the longitudinal slots and the Appellants do not point to a portion of the '881 patent specification restricting the slots to a certain dimension to satisfy the claimed function.").

Appellants submit that despite the overwhelming support in the claims and specification for Appellants' claim construction, the district court felt compelled to incorporate limitations with regard to the spacing, depth, and width of the "slot" based upon statements from Dr. C.K. Rhee made on behalf of Appellants in his initial reexamination declaration. (A3). With regard to the spacing of the slots, the

district court noted that Dr. Rhee stated that "the inventor placed slots 'in a very tight pattern.'" *Id.* According to the district court, this placement is "integral" to obtain the tight curves. *Id.* With regard to the depth and width of the slots, the district court also incorporated language concerning a "material" percentage of the depth and width such that there is a "material" impact on the part's ability to curve. (A6). The district court's belief was that the inventive feature was adding slots to substitute for the natural increase in curvature incident with the extrusion process. *See id.*

While Appellants submit that the other more "useful" and overwhelming intrinsic evidence supports a construction contrary to the one offered by the district court, Dr. Rhee provides additional statements that run afoul to the district court's reasoning. *Phillips*, 415 F.3d at 1317 (the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes"). More specifically, Dr. Rhee also states that the distinction of the '881 Patent is not that the slots *require* this curvature, but that the curvature is obtained through use of a material that is "'malleable' [at] ambient temperature." (A786). He goes on to state that the addition of plasticizers in the material results in a glass transition of the product that "can be made to curve at very extreme angles through the application of minimal heat." (A786). Therefore, contrary to the district court's analysis, Dr. Rhee actually discussed other ways the product can be tightly curved,

as opposed to just relying on the longitudinal slots. *See id.* Moreover, the word "material," with regard to the depth, width, or degree of curvature, was not mentioned once by Dr. Rhee, much less any degree of depth or width. *See* (A785–809). With reference below to FIG. 19 of Kemerer, a prior-art covering that, in fact, has very large slots, Dr. Rhee actually stated that it is the flexibility and malleability of the product, rather than the "slots," which make the product able to be formed in tight curves and avoid the spring stress found in the typical coverings. (A792).



When applying "argument-based" disclaimer, this Court has held that "the alleged disavowing actions or statements made during prosecution be both <u>clear and unmistakable</u>." *Omega Eng'g, Inc. v. Raytek, Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (emphasis added). As Dr. Rhee expressed multiple parameters that will lead to the product in the '881 Patent capable of being formed in a tightly curved formation, there was no clear and unmistakable disclaimer that *only* the spacing or size of the "slots" led to such formation.

Moreover, it was improper for the district court to pick and choose certain statements of Dr. Rhee's declaration to support the construction that was contrary to the overwhelming intrinsic evidence, which was also, as Appellants submit, influenced by the district court's viewing of a commercial embodiment of Appellants' product. Further, given principles of claim construction, adding, limiting, or varying the scope of the claims based on *post facto* explanations supporting two different interpretations, and found only in the prosecution history, should not be endorsed by this Court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) (proper role of prosecution history is to inform scope and meaning of claim and specification, not to add, vary, or enlarge claim language); *see also Elkay Mfg. Co. v. Ebco Mfg. Co*., 192 F.3d 973, 979 (Fed. Cir. 1999) ("[I]t is the totality of the prosecution history that must be assessed, not the individual segments of the presentation made to the [PTO] by the applicant . . . ."). Additionally, requiring the definition of the "slots" to require the slots "materially increase the ability to curve material" would also render claim 2, requiring a "tightly curved formation," to be superfluous and redundant, a methodology not condoned by this Court. *See* (A6); *Curtiss-Wright Flow Control Corp. v. Velan, Inc.,* 438 F.3d at 1374, 1381 (Fed. Cir. 2006).

## II. The District Court Erred by Comparing Features of an Actual Commercial Embodiment of Defendants' Product to Features of an Actual Commercial Embodiment of Plaintiffs' Product at the June 6, 2013, Technology Conference that Occurred before Claims Construction of the '881 Patent.

The district court's comparison between Appellant's commercial embodiment of its product and Appellee's accused product was irrelevant, prejudicial, and constitutes reversible error. In *SRI International v. Matsushita Electric Corp. of America*, this Court held that:

> A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device. Contrary to what MEI's counsel wrote the district court, claims are not construed "to cover" or "not to cover" the accused device. That procedure would make infringement a matter of judicial whim. It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement.

775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (emphasis in original); *see also Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006).

This Court held in *Wilson Sporting Goods Co.* that:

> The rule [of construing claims with reference to an accused device] forbids a court from tailoring a claim construction to fit the dimensions of the accused product or process and to reach a <u>preconceived judgment of infringement</u> or noninfringement. In other words, it forbids biasing the claim construction process to exclude or include specific features of the accused product or process. The rule, however, does not forbid awareness of the accused product or process to supply the parameters and scope of the infringement analysis,

including its claim construction component. . . . In light of these principles, if the litigants cannot themselves inform a trial court of the specific issues presented by the infringement inquiry-that is, issues of the breadth of the claim construction analysis and the most useful terms to facilitate that defining process—then a trial court may refer to the accused product or process for that context during the process.

*Wilson Sporting Goods Co.*, 442 F.3d at 1331 (emphasis added).

The Parties made the district court well aware of the three essential claim terms in dispute, thereby obviating the need to view the accused device at issue. *See* (A1966). Notwithstanding, it is undisputed that Appellees provided the district court with samples of the accused devices before claim construction. *See, e.g.*, (A1653). While the district court noted in the "technology tutorial" that it was not there to engage in a comparison between the Appellees' and Appellants' products, Appellants respectfully submit that this was exactly what took place. *See* (A4203). More specifically, two hours after making that statement, and after receiving Appellants' products, the district court articulated and evidenced its preconceived judgment of infringement by comparing Appellees' and Appellants' products, asking Appellees "how did you lose this case? [referring to *Flexiteek I*] . . . It's almost like saying how did McDonald's get the verdict that happened with the spilled coffee." (A4262); (A4335–39, at 10:06, 2:09:00) (implying that the instant case was akin to the infamous McDonald's hot coffee case). Appellants submit that the district court's comparison and preconceived judgment of infringement was improper under *SRI Int'l* and its progeny.

### III. The District Court Erred by Finding No Genuine Issue of Material Fact with Regard to Whether the Recesses Found on Side Edges of a Single Plank of Defendants' Products were not "Relatively Close Together," when the Claim Recites the Plural "Planks."

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact or issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for a nonmoving party. *Id.* at 248; *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). To carry the burden of summary judgment, a moving party not bearing the burden of proof at trial must either (1) produce evidence negating an essential element of the non-moving party's claim or defense or (2) show an absence of evidence to support the non-moving party's case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993).

The standard is "not whether there is literally no evidence, but whether there is any upon which a [trier of fact] could properly proceed to find a verdict for the party producing it, upon which the onus of proof is imposed." *Anderson*, 477 U.S. at 242. In determining whether to grant the motion, the court must consider whether there are reasonable and justifiable inferences that can be drawn in the non-moving party's favor. *See Hunt v. Cromartie*, 546 U.S. 541, 552 (1999). Deciding whether an inference is reasonable requires that the court "cull the universe of possible inferences established by weighing each against the abstract

standard of reasonableness." *WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988) (internal citations omitted). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

Claim 1 of the '881 Patent recites "the surface covering comprises planks or sheet of a flexible material adapted to be interconnected aside of each other thereby." (A287). Because the plural version of plank is present, along with "sheet," which encompasses multiple planks, the claim covers more than just a single plank. *See id.* In its Order Granting Defendant's Motion for Summary Judgment, the district court addressed certain products of Appellees that are referred to as a "shiplap" design. *See* (A46–47). There, the court noted that "[c]ertain PlaSTEAK products have 'L'-shaped notched edges such that the top of the plank overhangs the bottom." (A46); *see also* (A2898). A demonstrative representation of a front elevational view of the shiplap design is depicted below.

### Shiplap Design



*See* (A2898).

The court then found that:

By definition, the structure Plaintiffs argue is a slot is separated from the next closest structure by at least the entire non-edge part of the

plank which would account for 91% of the total distance of a 2 inch plank and 97% of the total distance of a 6 inch plank.  As such, a reasonable juror could not find these recesses are spaced relatively close together.

(A47).

This finding is erroneous on two grounds.  First, it does not identify the size of the "sheet of a flexible material" the court was analyzing, if any, and it does not identify the data upon which the court relied to determine that a slot that repeats every two inches in that "sheet of a flexible material" would not be considered by one of skill in the art to be "spaced relatively close together."  A reasonable juror could find that, on the bow of a large boat, a slot that repeats every two inches could easily be considered "spaced relatively close together."  *See* (3195–200) (depicting an exemplary installation of Appellees' products over a bow of a boat).  Appellants' expert, Dr. Jones, opined that the Fifteen Samples, E-521, E-522, E-600 Teak7, E-602, E-603, E-605, and E-607, literally, and under the doctrine of equivalents, infringe the term "longitudinal slots." *See* (A3142–44, at ¶ 13(iii)-(vi)).  The accuracy of Dr. Jones' conclusion should be determined by a jury, not by the court at the summary judgment stage.

A second error by the district court pertains to the district court's acknowledgement that Appellees produced a product where "the notched edge feature occurs on both longitudinal sides of the plank, which Plaintiffs call a "T-Edged Plank." (A47 n.14).  Appellees' "T"-edged planks reveal longitudinal slots,

unmistakably visible to the naked eye.  *See* (A2887–88).   A demonstrative representation of a front elevational view of the T-edged design is depicted below.

### "T"-Shaped Design



*See* (A2887–88).

These slots in this design run the length of the planks and form a base for adhesive or other similar material.  *Id.*; *see also* (A3104, at ¶ 42, 42a).  Necessarily, if each plank has a slot on both outer edges, those slots would be directly next to the slot on the outer edge of each adjacent plank.  The court failed to provide any factual analysis as to why no reasonable juror could find that two slots immediately next to one another would be considered by one of skill in the art to be "spaced relatively close together."  Based on the above, Plaintiffs have shown that there is a genuine issue of material fact as to whether the Fifteen Samples, E-521, E-522, E-600 Teak, E-602, E-603, E-605, and E-607 include "longitudinal slots."

### IV. The District Court Erred by Finding "Plaintiffs are Estopped from Claiming Equivalence" with Regard to Microstructural Recesses.

Prosecution history estoppel is applicable when the doctrine of equivalents is invoked and "requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002).  Specifically, the

court held "that a narrowing <u>amendment</u> made to satisfy any requirement of the Patent Act may give rise to an estoppel" and that "[e]stoppel arises when an <u>amendment</u> is made to secure the patent and the amendment narrows the patent's scope." *Id.* at 736 (emphasis added). The district court in the instant case used the same rationale for interpreting "longitudinal slots" as it did to limit Appellants' use of the doctrine of equivalents to support infringement for microstructural recesses found under Appellees' products. *Compare* (A3–6) *with* (A45). Said another way, the district court applied an "argument-based" theory of prosecution history estoppel to limit the application of the doctrine of equivalents ("DOE"), rather than an "amendment based" theory.

The district court erred for two reasons. First, Appellants submit that prosecution history estoppel, as discussed by the Supreme Court in *Festo*, only applies to "amendment-based" estoppel. As discussed above, the Supreme Court in *Festo* only applied estoppel in the context of amendments made in prosecution of a patent. *Festo Corp.*, 535 U.S. at 736. Indeed, even the district court appeared to note *Festo*'s reach only extended to claim amendments. *See* (A45 at n.10) (quoting *Festo* for its holding "that the patentee should bear the burden of showing that the amendment does not surrender the particular equivalent in question").

The purpose of applying estoppel only in the context of amendments is buttressed by the rationale behind its application. More specifically, the Supreme

Court emphasized the need to preserve the value of a patent and deter copying by not limiting the claims to their literal terms. *Festo Corp.*, 535 U.S. at 731–32. IN that vein, the importance of maintaining a patent's value is balanced with the somewhat less important need to inform the public of the bounds of said claims. *See id.* Therefore, the Supreme Court stressed the importance of focusing on the rejection(s) by the USPTO and any amendment responding thereto, thereby creating a clear public record "that the invention, as patented, does not reach as far as the original claim." *Id.* at 734. Applying "argument-based" estoppel is inconsistent with the *Festo* framework. See *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("When it comes to the question of which should control, an erroneous remark by an attorney in the course of prosecution of an application or the claims of the patent as finally worded and issued by the Patent and Trademark Office as an official grant, we think the law allows for no choice. The claims themselves control.")

Assuming, *arguendo*, that the application of "argument-based" estoppel was proper, Appellants submit that the district court erred by finding that Appellants' statements amount to a clear and unmistakable disclaimer. Again, disclaimer is centered on promoting "the public notice function of the intrinsic evidence and protect[ing] the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc. v. Raytek, Corp.*, 334 F.3d 1314, 1324 (Fed. Cir.

2003). When applying "argument-based" disclaimer, this Court has held that "the alleged disavowing actions or statements made during prosecution be both <u>clear and unmistakable</u>." *Id.* at 1326 (emphasis added). Just like a "*patentee* may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record," Appellants submit that a *district court* should be held to the same standard. *See Southwall Tech. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) (emphasis added).

For the same reasons stated above in Section I.C, *supra*, the district court limited Appellants' use of the doctrine of equivalents to support infringement for microstructural recesses found under Appellees' products. *Compare* (A3–6) *with* (A45). More specifically, the district court parroted similar language used by Appellants' representative, Dr. Rhee, in the reexamination proceeding to describe one of many reasons the product of the '881 Patent can be tightly curved. *See* (A45). The district court's use of Dr. Rhee's statement, however, was in disagreement with the clear public record of the definition of term "longitudinal slots." During the reexamination of the '881 Patent, three examiners stated with regard to the term "slots" and in response Dr. Rhee's statement¸ *inter alia*:

> This broad, functional language is met by **any structure that is capable of performing the recited functions of facilitating the formation of curved coverings and acting as a base for glue/adhesive**.
>
> . . .

> The fact that the slots [in the Kemerer reference] are "large" is immaterial since the claims do not define the relative size of the slots.

(A236) (emphasis added); *see also* (A253).

This definition was again buttressed by three administrative judges at the BPAI on appeal. *See* (A3579) ("Appellants' claim 1 does not recite specific dimensions of the longitudinal slots and the Appellants do not point to a portion of the '881 patent specification restricting the slots to a certain dimension to satisfy the claimed function."). Therefore, the public was put on notice of the scope of the term "longitudinal slots."

As a result of the USPTO's definition of the term "longitudinal slots," claim 1 of the '881 Patent was found to be invalid over the Kemerer reference asserted by the Appellees. It is fundamentally unfair to adopt one clear and public definition that permitted Appellees to win on their invalidation attack and then, immediately thereafter, for the district court to impose on Appellant almost the opposite definition—one that was specifically rejected by the BPAI—which now allows Appellees to escape infringement. In other words, the USPTO and the district court have taken diametrically opposing positions and Appellants have been declared the loser on both. Such a result simply cannot stand.

Moreover, Appellants submit that Dr. Rhee offered various reasons why the invention was distinguished from the prior art, the "longitudinal slots" just being one of them. *See supra* Section I.C. Therefore, the district court's selection of

only certain portions of Dr. Rhee's declaration was not a clear and unmistakable disclaimer. Moreover, Dr. Rhee's statements pale in weight compared to the other clear intrinsic evidence of said term in the claims, specification, and statements from the USPTO. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) ("[I]t is the totality of the prosecution history that must be assessed, not the individual segments of the presentation made to the [PTO] by the applicant . . . .").

Therefore, for the above-described reasons, the district court erred by applying prosecution history estoppel to prevent application of the DOE.

## CONCLUSION

Appellants are asking this Court to pronounce a bright line rule that district courts may not consider the patent holder's preferred commercially available embodiment or the accused device prior to defining claim terms. Observing one of numerous available configurations—created after the patent was issued—introduces extrinsic evidence that has no place in an analysis that must focus, first and foremost, on intrinsic evidence. Not only are Appellants asking this Court find that the district court's approach placed manufacturing plaintiffs at a disadvantage over non-practicing entities, thereby invoking Constitutional considerations, but the district court's interpretation of the term "longitudinal slots" was contrary to intrinsic evidence associated with the '881 Patent.

Appellants are also asking this Court find that the district court's comparison of features between Appellants' and Appellees' products at the a "technology tutorial" hearing that occurred before claims construction was error and prejudiced the Appellants, thereby requiring reversal and remand of the district court's claim construction and infringement orders. Further, Appellants are also asking this Court to allow the jury to decide genuine issues of material fact that exist in this case with regard to the spacing and sizing of slots found on Appellees products, and, to permit application of the DOE with regard to microstructural slots found on Appellees' products.

DATED May 20, 2014.

Respectfully submitted,

By:     /   Scott D. Smiley /
        Scott D. Smiley, Esquire
        Florida Bar Number: 678341
        Mark Johnson, Esquire
        Florida Bar Number: 84365
        The Concept Law Group, P.A.
        *Counsel for Appellants- Flexiteek Americas,*
        *Inc. and Flexiteek International AS*
        Michael I. Santucci, Esquire
        Florida Bar Number: 105260
        Daniel Devine, Esquire
        Florida Bar Number: 92342
        Santucci Priore, P.L.
        *Counsel for Appellants- Flexiteek Americas,*
        *Inc. and Flexiteek International AS*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## FLEXITEEK AMERICAS, INC.
### vs.
## PLASTEAK, INC.

### CASE NO. 14-1214

### <u>ADDENDUM INDEX</u>

| Addendum No. | Docket No. | Description | Appendix Page Number |
|---|---|---|---|
| 1 | 178 | Order on Claims Construction | A1-9 |
| 2 | 255 | Order Granting Defendants' Motion for Summary Judgment | A51-62 |
| 3 | 256 | Final Judgment | A63 |
| 4 | 1.3 | Patent in Suit: U.S. Patent No. 6,895,881 | A110-120 |
| 5 | 1.7 | Patent in Suit: Reexamined U.S. Patent No. 6,895,811 | A130-134 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60215-CIV-SEITZ/SIMONTON

FLEXITEEK AMERICAS, INC. and
FLEXITEEK INTERNATIONAL AS,
                    Plaintiffs,
vs.

PLASTEAK, INC. and PLASDECK,
INC.,
              Defendants.
_____/

## ORDER ON CLAIMS CONSTRUCTION

THIS CAUSE came before the Court on the parties' Joint Claims Construction Statement [DE 136], Supplemental Joint Claims Construction Statement [DE 148], and following a non-evidentiary Technology Tutorial held on June 6, 2013. The parties have advised that a *Markman* hearing is unnecessary for claims construction in this matter and that the Court could construe the disputed claim terms solely on the papers. To that end, the parties have jointly identified three terms from the patent-in-suit, U.S. Patent 6,895,881 (the "'881 patent"), which are disputed and require claims construction: (1) longitudinal slots; (2) interconnected; and (3) tightly curved. After a careful review of the parties' claims construction statements and the '881 patent and its file history, the Court construes the claims as follows:

### I.       CLAIM CONSTRUCTIONS

*a.   Longitudinal Slots*

The term "Longitudinal Slots" appears in cancelled Claim 1 and all of the independent claims of the re-examined '881 patent, Claims 9, 12, 15, 18, 22, and 27.[1] The following claim elements language appears in all 7 of these claims:

> . . . the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient. . .

---

[1] Longitudinal slots are also referred to in Claims 3, 7, and 27. There they are describe as ". . . wherein the planks or sheet are formed with a plurality of longitudinal slots at the underside. . ." Both usages are incorporated into Claim 27. The absence of slots is referred to in Claim 4 in the description of the intermediate caulking strips: "The intermediate caulking strips have lower surfaces without longitudinal slots."

Based on the plain language of the claims, longitudinal slots serve two distinct functions - they facilitate the planks' curvature and they serve as a base for glue or adhesive. The parties agree, based on their proffered definitions, that the construction of "longitudinal slots" should recite both of these functions, should refer to the slots in the plural, and that it should describe the slots as running the length of the plank or sheet. The key disagreement is about whether any other limitation should be added to claim as construed.

Plaintiffs propose the following definition for longitudinal slots:

Recesses that extend in the direction of the length of the planks or sheet that forms a volume sufficient to (1) facilitate curving and (2) provide a surface connection by means of glue or adhesive material to a surface being covered.[2]

Defendants have proposed two alternatives. Both include limitations concerning how the slots are spaced relative to each other and the depth and width of the slots. The inclusion of these additional limitations is discussed in turn below. Defendants' two proffered definitions differ from each other in how the depth and width limitation is expressed. The first alternative describes the depth and width of the slots by an expression of relative numerical value as follows:

Multiple recessed grooves spaced relatively close together, in relatively equal parallel distance to each other for the length of the panel or sheet, wherein the grooves have a depth of approximately 25 to 75 percent of the material thickness, and width at the underside of approximately 25 percent of the material thickness, increasing the ability to curve and increasing surface area for adhesion.

The second definition describes the depth and width of the slots in functional terms:

Multiple recessed grooves spaced relatively close together, in alternating, relatively equal, parallel grooves and ridges, for the length of the panel or sheet, wherein the grooves have a depth and width of a material percentage of the material thickness such that, in combination, they materially increase the ability to curve and increase surface area for adhesion.

Slot Spacing

Claims are construed to reflect how "one ordinarily skilled in the art" would understand the claim term at issue. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Claims are context-

---

[2] Plaintiff notes that its preferred construction is one wherein the slots are described only as running the length of the planks and being used to facilitate curving and as a base for adhesive but has amended its definition to include that the slots "form a volume" to "assist the Court in its construction." [DE 148, p. 3.]

dependent and must be interpreted in light of the patent's specifications and prosecution history. *Id.* Defendants propose that the language "grooves spaced relatively close together, in alternating, relatively equal, parallel grooves and ridges" should be included in the claim as construed. Here, a person of ordinary skill in the art who read the '881 patent and was familiar with its file history would understand that even though slot spacing is neither discussed in the claim language nor the text of the specification, the patent nonetheless teaches parallel-running, longitudinal slots spaced relatively close together.

The specification discloses this slot-configuration in figures 1, 6, and 11. In every instance where slots are illustrated in the specification they run in parallel to each other, are spaced relatively close together, and are equally apart. Moreover, the slot spacing shown in the illustrated figures is corroborated by the descriptions of slot spacing from the prosecution history. The Declaration of Dr. C.K. Rhee, which the patent owner filed during the reexamination of the '881 patent, specifically notes that the inventor placed the slots "in a very tight pattern. . . [t]he close longitudinal slots substantially increase the mechanical ability of the sheet and plank to curve." ["Declaration of Dr. C.K. Rhee, Ph.D." DE 77-4, p. 21]. As is discussed below, this ability to be laid in tightly curved formations affixed only with glue or adhesive is the '881 patent's significant advancement over the prior art.  The placement of the slots is integral to this ability.  As Dr. Rhee notes: "The specification indicates that the underside longitudinal structure is illustrated in Figure 6 which describes a number of parallel slots or ribs which are spaced closely at roughly equivalent distance, . . . so that it can by curved in the manner set forth in Figures 3, 4, and 10. The degree of curvature described in those figures are [sic] tight or at extreme angles. . ." [*Id.,* p. 22]. One skilled in the art would understand that to achieve tight curving with only the use of glue or adhesive, the primary advancement of the invention, the longitudinal slots should run parallel to each other and be spaced in a close-together pattern. As such, the claim as construed will include language that reflects this configuration.

<u>Depth and Width</u>

A statement concerning the depth and width of the slots will also be incorporated into the construction of the term longitudinal slots.  Claims must be construed with a full understanding of what

the actual invention contained within the patent is and what the patent intended to claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005); *United States v. Adams*, 383 U.S. 39, 49 (1966) ("[I]t is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention."). Here, it is especially important that the depth and width of the slots be included in order to capture the essence of the invention because the invention taught by the '881 patent is an exaggeration of a "natural" condition.

The invention of the '881 patent is the addition of longitudinal slots to the underside of the plank or sheet which enable the plank or sheet to be laid in tightly curved formations and affixed only with glue or adhesive. The invention, presumably, was borne out of the inventor's observation that increased flexibility in the longitudinal direction is a bi-product of the extrusion process itself. As Dr. Rhee describes, the problem of the prior art that the invention solved was one of durability. The inherent polymer chemistry of the plastics and resins used to make thermoplastic products limits the finished products' flexibility. These materials have a degree of inherent stiffness but this can be overcome by the addition of plasticizer. The products become more flexible, but a consequence of adding plasticizer is diminished durability.

As described above, the inventor of the '881 patent was aware that the extrusion process aligned the molecules in the direction of extrusion which resulted in an "extended longitudinal structure" that adds "an extra degree of flexibility along the axis that is slightly greater than the degree of flexibility that is inherent in the material itself." [DE 77-4, p. 21]. His inventiveness was recognizing that by mimicking these molecular arrangements by slotting the underside of the plank, one could achieve flexibility well beyond what was yielded by extrusion alone. The addition of these longitudinal slots "represents the true innovation of this patent which is novel and patentable." [*Id.*, p. 20]. Because enhanced flexibility is attained through mechanical rather than chemical means, durability is not compromised.

A difficulty of claim construction in this case is that because the invention is an enhancement of a "natural" property of the extrusion process, the claim as construed must adequately capture what the invention is without being overbroad. Defendants' first proffered definition, however, is inadequate

4

**A4**

because it tacks toward the overly-specific. It addresses the depth and width of the slots in numeric terms, specifically that the slots have a depth of "25 to 75 percent of the material thickness" and "a width at the underside of approximately 25 percent of the material thickness." Defendants' justification for using such a specific description is that the claims at issue are means-plus-function claims, and as such, the claims are limited to the embodiments disclosed by the specification and equivalents. These claims are not means plus function claims and should not be limited as Defendants propose.[3] *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 – 1314 (Fed. Cir. 2005).

Defendants' second definition appropriately captures the distinction between the slots claimed in the '881 patent and the molecular formations "naturally" yielded by extrusion. The word "material" in the Defendants' second definition distinguishes the invention, slots that are enhanced over the latent longitudinal structures created incident to extrusion from the art not taught by the patent without importing numerical descriptors that would unduly limit the claims:

> . . . the grooves have a depth and width of a material percentage of the material thickness such that, in combination, they materially increase the ability to curve and increase surface area for adhesion

Plaintiffs contend that the prosecution history disclaims size-based limitations and quote the following language from the re-examination:

> Claim 1 broadly recites planks formed with longitudinal slots at the underside thereof 'for facilitating forming of curved coverings and for acting as a base for a glue or adhesive

---

[3] Plaintiffs have not addressed Defendants' argument that the claims at issue are means-plus-function claims. The language of the claims uses the phrase "*by means of which*." Use of the word "means" in claim language triggers the presumption that the claim falls under the ambit of 35 U.S.C. §112 ¶6, which allows for a claim element to be expressed as a means for preforming a function without the recital of a corresponding structure for preforming the function with the claim construed to cover the corresponding structure in the specification and equivalents. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361 (Fed. Cir. 2005). The presumption is rebutted where the claim language itself provides the structure that preforms the recited function. *See Phillips*, 415 F.3d 1303 (finding that a claim limitation stating "means disposed inside the shell for increasing its load bearing capacity comprising internal steel baffles" provides the relevant structure and is not limited to the embodiments in the specification.) The claim language at issue here is as follows:

> . . . the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material *by means of which* the surface covering is mounted on a surface recipient. . . (emphasis added)

The claim itself recites the structures used for mounting the surface covering to the surface recipient, *i.e.,* glue or adhesive, and the slotted underside of a plank or sheet. Like the baffles in *Phillips*, the claim itself describes the structure to be employed for the function and, accordingly, does not warrant means-plus-function treatment.

> material by means of which the surface covering is mounted on a surface recipient'. This broad, functional language is met by any structure that is capable of performing the recited functions of facilitating the formation of curved coverings and acting as a base for glue/adhesive . . . . The fact that the slots are "large" is immaterial since the claims do not define the relative size of the slots." ["Examiner's Answer" DE 77-4, p 119.]

Plaintiffs' contention is worthwhile, but misplaced.  The quoted statement was in response to Plaintiffs' attempt to differentiate its invention over the Kemerer art (discussed more fully below) based, among other factors, on slot size.  ["Amendment Response to Ex Parte Reexamination" DE 77-5, p. 20.]   Unlike a re-examination, where applicants seek to distinguish how a claimed invention is different from those previous, the purpose of claims construction is to assist the trier of fact understand what someone of ordinary skill in the art would understand the patent actually claims.   Here, the relative depth and width are being invoked to reflect that the '881 patent teaches, in part, longitudinally-slotted planks as an enhancement over the molecular structures formed incident to extrusion.  As such, characterizations of depth and width should be included in the construction of "longitudinal slot."

While the substance of Defendants' definition will be incorporated, the wording must be altered.  The phrasing of Defendants' definition is unwieldy and redundant and claims should be construed so as to be understandable to the jury. *See Mediatek, Inc. v. Sanyo Elec. Co. Ltd.*, 513 F. Supp. 2d 778, 789 (E.D. Tex. 2007).  Accordingly, the Court defines longitudinal slot as follows:

> **Grooves spaced relatively close together that run parallel to each other for the length of the planks or sheet, wherein the grooves have a depth and width of a material percentage of the planks' or sheets' thickness such that the grooves materially increase the ability to curve and the surface area for adhesion.**

*b. Interconnected*

The phrase "adapted to be interconnected aside of each other" appears in all independent claims of the '881 patent.  Plaintiffs submit that the term "interconnected" should be given its plain and ordinary meaning - "joined together so as not to separate."  Defendants' proposed definition imposes a functional limitation: "planks, sheets or intermediate strips joined together along their longitudinal edges wherein

6

**A6**

each edge assists in keeping the adjacent edge from lifting." The Court will accept Plaintiffs' definition.

The claim language, by its terms, does not require that the planks keep each other from lifting. The lifting limitation Defendants seek to impose in the claims as construed appears only once in the entire specification, in the description of a joining mechanism pictured in figure 5i which features interlocking components. Imposing this anti-lifting requirement on the term interconnected would potentially exclude the embodiments shown in figures 5a and 5e, which have straight edges and which do not outwardly confer any anti-lifting benefit. "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *See Lava Trading, Inc. v. Sonic Trading Mgm't*, 445 F.3d 1348, 1355 (Fed. Cir. 2006) quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir.2005) (en banc). Incorporating the lifting limitation would exclude at least two of the embodiments disclosed by the patent. Because claim terms are to be construed within the context of the entire patent, the anti-lifting limitation will not be incorporated. Interconnected will have its plain and ordinary meaning: **"joined together so as not to separate."**

    *c.  Tightly Curved*

Claims 2, 9, 12, 15, 18, and 28 use the language "[a shape conforming surface] . . . wherein the planks or sheet are mounted on the surface recipient in a tightly curved formation. . ." Plaintiffs propose that tightly curved means: "a high degree of curvature towards the limit of the inherent curvature of the product." Alternatively, Plaintiffs propose: curvature to an angle exceeding the inherent curvature of the material." Defendants propose: "Curvature of an acute angle exceeding the inherent ability of the material to curve." The Court will accept Plaintiffs' alternate definition.

Claim 1, the patent's sole claim before re-examination, recited the words "laid in curved formations." The phrase "tightly curved" was added in the re-examination after the PTO found that Claim 1 was anticipated by the art disclosed in Kemerer. Kemerer teaches large area thermoplastic panels that can be textured to simulate wood and used to cover walls, floors, or roofs. These panels are prepared by extruding a thermoplastic material such as PVC. The Board of Patent Appeals and Interferences

7

**A7**

reasoned that because an inherent property of materials like PVC is their ability to curve, Kemerer could inherently facilitate forming curved coverings. ["Decision on Appeal" DE 77-3, p. 12.]

The phrase "tightly curved" that appears in Claims 2, 9, 12, 15, 18, and 28 was added to disclose a unique ability of the invention of the '881 patent of which Kemerer was incapable, being laid in tightly curved formations without the use of additional fixation besides glue or adhesive. [*See* "Amendment Response to Ex Parte Reexamination" DE 77-5, p. 2.] One of ordinary skill in the art would understand that under these circumstances "tightly curved" can only mean a curvature which *exceeds* the inherent ability of the material to curve. However, inclusion of the words "acute angle" into the claim as a further limitation would be improper. Defendants reason that because the prosecution history describes an angle of curvature which is "extreme," the word "acute" is an appropriate substitute. The word "acute," however, is a mathematical term which means an angle of less than 90 degrees. Such a term should not be implied into the claim because "[i]t is usually incorrect to read numerical precision into a claim from which it is absent." *Modine Mfg. Co. v. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 abrogated on other grounds by *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed.Cir.2000). Though not imposing the word acute on the definition may pass a less precise term to the jury "[A] sound claim construction need not always purge every shred of ambiguity." Accordingly, tightly curved will be defined only as **"curvature to an angle exceeding the inherent curvature of the material."**

## II.    CONCLUSION

It is therefore,

ORDERED THAT

(1) The claims are construed as follows:

Longitudinal Slots - Grooves spaced relatively close together that run parallel to each other for the length of the planks or sheet, wherein the grooves have a depth and width of a material percentage of the planks' or sheets' thickness such that the grooves materially increase the ability to curve and the surface area for adhesion.

Interconnected - Joined together so as not to separate.

Tightly Curved - Curvature to an angle exceeding the inherent curvature of the material.

8

**A8**

(2)  In light of the issuance of this Order and the parties having filed Joint Claims Construction Statements [DE 136, DE 148], the following motions are DENIED AS MOOT:

a.  Plaintiff's Motion to Strike Defendants' *Markman* Briefs and to Preclude Defendants' Extrinsic Evidence for Claims Construction. [DE 116].

b.  Plaintiffs' Motion for Clarification of Order Clarifying Order Setting *Markman* Hearing, to Exclude Defendants' Expert Harlan Wilk from Testifying as to New Subjects and to Exclude Defendants' Use of Plaintiffs' Products and Defendants' Products at the *Markman* Hearing. [DE 127].

DONE AND ORDERED in Miami, Florida, this 16 day of July 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    Honorable Andrea M. Simonton
       All counsel of record

9

**A9**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60215-CIV-SEITZ/SIMONTON

FLEXITEEK AMERICAS, INC. and
FLEXITEEK INTERNATIONAL AS,
                Plaintiffs,
vs.

PLASTEAK, INC. and PLASDECK,
INC.,
               Defendants.

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court on Defendants Plasteak, Inc. and Plasdeck

Inc.'s ("Plasteak") motion for summary judgment.  [DE 196].  This is a patent infringement case.

Plaintiffs Flexiteek Americas Inc., and Flexiteek International A.S. ("Flexiteek") own U.S. Patent

6,985,881 ("the '881 patent") for a "Shape Conforming Surface Device."  Plasteak makes and sells

extruded floor coverings principally used on the decks of yachts and boats that simulate teak and other

exotic woods.  Flexiteek alleges that Plasteak, an industry competitor, willfully, directly and indirectly

infringed the '881 patent.  Flexiteek also alleges that Plasteak violated the Florida Deceptive and Unfair

Trade Practices Act ("FDUTPA") by deceptively posting on Plasteak's website that the Patent and

Trademark Office had rejected the '881 patent.

Having carefully considered the motion, Plaintiff's opposition [DE 217], reply [DE 226], and

the record, summary judgment must be granted for Defendants on all counts.  As to the allegations of

infringement, summary judgment must be granted because no reasonable juror could find the accused

devices have "longitudinal slots," a limitation of each of the re-examined '881 patent's claims.  As to

the FDUTPA claim, summary judgment is warranted because Plaintiffs have not offered any evidence

of causality between Plasteak's allegedly deceptive statements and Flexiteek's claimed damages.

## I.     BACKGROUND[1]

### a.   The Accused Device

Plasteak makes and sells extruded plastic planks that are assembled into deck coverings for boats and yachts. The advantage of PlasTEAK[2] over the exotic woods typically used to cover boat decks is that PlasTEAK is more durable and requires much less upkeep. The planks are inherently flexible and are sold in rolls that are cut to the deck's specification, either by the "do it yourself" boat owner or a professional installer. The accused devices differ from each other by color, finish, edge structure, and the presence of simulated caulking lines.[3]

### b.   Litigation History and Re-Examination of the '881 Patent

This is the second time Flexiteek has sued Plasteak for infringement of the '881 patent. In the first case a jury found Plasteak had infringed the patent and awarded Flexiteek $79,632.00 in damages. *Flexiteek Americas, Inc. et al. v. Plasteak, Inc., et al.*, Case No. 08-60996-CIV-COHN/SELTZER ("*Flexiteek I*"), [DE 158]. Judge Cohn, who presided over the earlier case, also entered a Permanent

---

[1] Unless otherwise noted the facts are derived from the undisputed record evidence.

[2] As it is used here, PlasTEAK is the trade name of the accused devices.

[3] Problematically, not all of the products described in the record have an identified product number. The accused devices are described in detail at three places in the record. The first place is in Plaintiffs' expert's report [DE 196-1] and declaration [DE 218-3]. Plaintiffs' expert, Dr. Frank Jones, discuss two sets of the accused devices. The first set he considered contained fifteen samples. He described some of these by model name, but others he only described by appearance. [218-3, ¶4]. The second set contained eleven samples. All of these were identified by product number. *Id.* at ¶3. The extent to which products from the two groups overlap is unclear. The second place in the record where the accused devices are described in detail is in the exhibit attached to the affidavit of Defendants' CEO, William Gribble. [DE 196-2]. This exhibit contains multiple close-up photographs of what Gribble claims is the entire product line. [DE 196-2]. This group consists of eleven products. Notably, these are the same as the eleven products as the second set Dr. Jones examined. Finally, some of the accused devices are pictured in the exhibits cataloguing the samples submitted in consideration of the motion [DE 248] and in opposition [DE 247]. Defendants submitted twelve product samples. Eleven of these are the same products from the Gribble affidavit and the expert's second sample set. The twelfth sample, E-601, is a discontinued glow-in-the-dark sample. Plaintiffs submitted two samples in conjunction with their opposition. Neither is identified by product number. The first is titled "Metallic Series Gold with Black Lines." The second is identified only with a sticker marked Defendant's Exhibit No. 19.

Plaintiffs contend that there is a genuine disputed material issue of fact as to which product lines the products described in the record belong to. [DE 217, p. 10]. The matter is immaterial because none of the products described in the record infringes the '881 patent.

2

Injunction.  [*Id.* at DE 212].  On July 20, 2009, about three weeks after the entry of final judgment in *Flexiteek I*, Plasteak filed a third-party request for reexamination with the United States Patent and Trademark Office ("PTO") on grounds that the patent examiners did not consider material prior art in the '881 patent's initial prosecution.  [DE 77-5, p. 124].

As it originally issued, the '881 patent had a single claim.  Pursuant to Plasteak's third-party request for reexamination, the PTO rejected this claim on anticipation and obviousness grounds.  The office action was dated January 29, 2010.  Thereafter, Flexiteek sought to amend claim 1 and to add 28 new claims to the patent.  The PTO examiner found claims 2 – 28 patentable but again rejected Claim 1 for anticipation and obviousness.  The Board of Patent Appeals and Interferences affirmed the rejection of Claim 1 in a written decision but only on anticipation grounds.  A Certificate of Reexamination issued on December 6, 2011, containing claims 2 – 28.  In an order issued October 31, 2012, Judge Cohn vacated the Final Judgment and Permanent Injunction in *Flexiteek I* reasoning that because the patent's date of enforcement started on the date of amendment Plasteak was not liable for infringement of an unenforceable patent.  [DE 308, p. 4, 08-60996-CIV-COHN/SELTZER].

### c.  *Plasteak's Published Statements Concerning the Litigation and Reexamination*

Plasteak published several posts on its website related to *Flexiteek I* and the reexamination. Among these were a February 8, 2010 entry titled "January 29, 2010 U.S. Patent Office Rejects the Whitaker Patent Used by Flexiteek," which stated:

> Upon re-examination of this patent, the U.S. Patent Office has rejected patent #6,895,881 (the " '881 Patent") on two counts with the conclusion that the patent does not provide sufficient parameters to demonstrate any uniqueness or originality of their product when compared to earlier patents. The rejection of the '881 Patent means that Flexiteek no longer has a valid U.S. Patent to infringe upon! [DE 196-1, ¶15].

Additionally, Defendants issued a press release via their website which analogized the litigation to "David versus Goliath" and claimed Plaintiffs were "a massive and wealthy multi-national corporation," which had "some impressive and expensive lawyers."  [DE 218, ¶62].

3

A53

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

## III.      INFRINGMENT

"Patent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence." *Siemens Med. Solutions USA, Inc. v. Saint–Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011). Resolving infringement claims is a two-step process. *North Am. Container Corp. v. Plastipak Packaging, Inc.*, 415 F.3d 1335 (Fed. Cir. 2005). First, the Court must construe genuinely disputed claim terms as a matter of law. Here, three terms were disputed – "longitudinal slots," "interconnected," and "tightly curved." The Court defined those terms in its previously issued Claims Construction Order. [DE 178]. Second, the fact finder compares the construed claims to the accused device. Infringement can only be found if every claim or an equivalent is found in the accused device. "Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371, 1374–75 (Fed. Cir. 2007).

4

IV.     **SUMMARY JUDGMENT MUST BE GRANTED FOR DEFENDANTS ON INFRINGMENT (CLAIMS I – III)**

Because the longitudinal slots limitation applies to every claim of the reexamined '881 patent,[4] Defendants' motion for summary judgment on non-infringement presents a discrete threshold issue – whether, based on the record evidence, a rational trier of fact could find that there are longitudinal slots on the underside of the accused devices.[5]  The Court previously defined the term "Longitudinal Slot" as follows:

> Grooves spaced relatively close together that run parallel to each other for the length of the planks or sheet, wherein the grooves have a depth and width of a material percentage of the planks' or sheets' thickness such that the grooves materially increase the ability to curve and the surface area for adhesion. [DE 178, p. 8].

Juries in patent cases are instructed that that they must apply the court's construction of claim terms in their deliberations.  *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2005) (internal citation omitted).  Here, when asked to review the definition of "longitudinal slot" and explain what it describes, a reasonable juror could only describe a plank with an obvious series of undulating ribs and valleys at its underside.  The Court notes at the outset that none of the accused devices contain such a

---

[4] The term "Longitudinal Slots" appears in cancelled Claim 1 and all of the independent claims of the re-examined '881 patent: Claims 9, 12, 15, 18, 22, and 27.  Because the longitudinal slots limitation applies to all of the independent claims, it applies to all 28 claims of the patent.  The term "Interconnected" appears in cancelled Claim 1 and independent Claims 9, 12, 15, 18, and 27.  The term "Tightly Curved" appears in independent Claims 9, 12, 15, 18, and 27 and dependent Claims 2, 26, and 28. [DE 1-7, pp. 3-5].

The terms "male connection members" and "female connection members" appear in independent Claim 22 and dependent Claim 3.  Defendants have argued that these features are not present in any of the accused devices. [DE 196, p. 9].  Plaintiffs counter that the shiplap edge connection of products E-521, E-522 and E-600, among possibly others, is male/female connection. [DE 217, p. 4].  This edge structure is explained at greater length in section IV(c) *infra*, but generally, certain planks have an "L"-shaped recess running the entire length of their sides.  These planks were intended to abut a plank with an overhang running the entire length of its side.  Though the terms "male connection members" or "female connection members" were not construed, no reasonable juror could find that the side edge of these products is a male/female connection as those terms are commonly understood.  *See Phillips V. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.")

[5] Plaintiffs incorrectly assert that Defendants, as moving party, must prove that "all of its products" do not have longitudinal slots. [DE 217, pp. 9 – 10].  To prevail, Defendants only need to show the lack of a genuinely disputed material issue of fact in the record evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Here, based on the undisputed record evidence, the law entitles Defendants to summary judgment.

structure.  Despite the absence of obvious ribs, Plaintiffs nonetheless contend that all of the accused devices, except one,[6] infringe because in their expert's opinion at least four different types of recesses meet the definition of longitudinal slots.  Each recess type, which Plaintiffs' expert labels microstructural, under caulking strip, side edge, and between caulking lines and plank,  is discussed in turn below.  However, having reviewed the record evidence, which included inspecting 13 different samples of PlasTEAK, the Court must conclude that even when all reasonable factual inferences are resolved in Flexiteek's favor, no reasonable juror could find that any of the accused devices have the longitudinal slots limitation and therefore must grant summary judgment on infringement to Defendants.

    *a.*   *"Microstructural Recesses"*

        Plaintiffs claim that there are microstructural recesses on the underside of all the accused devices with the sole exception discussed in note 6.  Microstructural striations are inherent in extruded polymer-based products.  [*See* DE 218-3, ¶¶ 9 – 10 ].  In his report, Plaintiff's expert Dr. Jones roughly estimates there were between 50 and 100 ridges and valleys per inch on one sample he observed, meaning that each recess on the sample has a width of one-fiftieth (1/50) to one-one-hundredth (1/100) of an inch.[7]  [DE 196-1, ¶22].  Longitudinal slots are "grooves that have a depth and width of a material percentage of the plank's . . . thickness."  Applying this definition, no reasonable juror could find that recesses of such miniscule dimension could be longitudinal slots.

        Plaintiffs also argue that because the microrecesses on the accused devices are equivalent structures of the longitudinal slots described in the '881 patent, the accused devices infringe under the doctrine of equivalents.[8]  Under the doctrine of equivalents "[a]n element in the accused product is

---

[6] Plaintiff's expert concedes that the product designated "FLOROTHL Teak+Holly Mat Finish does not contain any longitudinal slots.  [DE 218-3, ¶9].  This product is the only one not manufactured by Plasteak.

[7] By way of comparison, the samples the Court reviewed were generally either 2 inches or 6 inches wide and about two-tenths (2/10) of an inch thick.  Individual grooves on the underside of the samples were indiscernible to the touch; the undersurface of the samples was either smooth or more akin to the texture of sandpaper as opposed to ribbed.

[8] Unlike the Plaintiffs other equivalence arguments (discussed at note 11 *infra*), the equivalence argument on microrecesses is not foreclosed because of a Rule 26 violation since Dr. Jones raised the equivalence of microrecesses at his deposition [DE 196 – 1, p. 187] and Defendants had the opportunity to rebut the argument.

equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Eagle Comtronics, Inc. v. Arrow Comm. Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002). The test for equivalence is whether the accused structure performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

Here, however, Plaintiffs are estopped from claiming equivalence of these structures because the patent owners took essentially the opposite position in the re-examination to secure patentability over the Kemerer *et al,* reference.[9]  Specifically, Plaintiffs' reexamination expert Dr. Rhee opined that the novelty of the '881 patent was the addition of longitudinal slots to the underside of the planks and that this addition of the slots or ribs, which "mimicked the structure" inherently present through extrusion of polymers, enabled the tight curving which secured patentability over the prior art. [*See* "Declaration of Dr. C.K. Rhee, Ph.D." DE 77-4, p. 21]  ("The addition of these longitudinal slots creates the ability of the sheet or plank to curve around tighter and tighter curves, where the more inherent flexibility of the material would only allow curvature over very slight or gradual curves.")  Where the patent owner abandons a more expansive claim for a more limited one in order to avoid the prior art, the patent owner is estopped from later claiming that which he necessarily abandoned is equivalent and infringes. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 734–35 (2002).[10] Accordingly, Flexiteek cannot now claim that the inherent microstructural recesses enable tight curving in a manner substantially similar to longitudinal slots.

    *b.  Recesses Under the Artificial Caulking Strips*

Plaintiffs next contend that a depression that runs under the artificial caulking strips of

---

[9] U.S. Patent No 4,290,248.

[10] Despite having been on notice of potential prosecution history estoppel at least since after Defendants filed their answer [DE 9, ¶78; *See also* Transcript of Technology Tutorial, DE 141, p. 32], Plaintiffs have not attempted to rebut estoppel under the *Festo* framework.  535 U.S. at 740 ("Just as *Warner-Jenkinson* held that the patentee bears the burden of proving that an amendment was not made for a reason that would give rise to estoppel, we hold here that the patentee should bear the burden of showing that the amendment does not surrender the particular equivalent in question.")

Case: 14-1214 Case: 14-1214 CASE PARTICIPANTS ONLY Document: 40 Document: 39 Page: 64 Page: 64 Filed: 05/20/2014 Filed: 05/20/2014

Case 0:12-cv-60215-PAS   Document 255   Entered on FLSD Docket 12/03/2013   Page 8 of 12

certain models is a longitudinal slot. [DE 218-3, ¶13(i)].  Utilizing an electron micrograph to measure the depressions of one specimen, Dr. Jones concluded the depressions are three one-thousandths (0.003) of an inch deep.[11]  This accounted for a depth of one-third to one-fourth *of one percent* of the planks' 0.17 inch thickness.  If asked to apply the longitudinal slot claim construction to these measurements, no reasonable juror could conclude that these depressions are "grooves have a depth and width of a material percentage of the planks' or sheets' thickness."  Plaintiffs have also argued equivalence citing Dr. Jones's opinion that cumulating the effect of these slots across multiple joined planks would materially increase the ability to curve and the surface area for adhesion.  However, because this opinion was not properly disclosed, that evidence is not before the Court and the argument is otherwise unsupported.[12]

  *c.   Recesses on the Side Edges*

  Certain PlasTEAK products have "L"-shaped notched edges such that the top of the plank overhangs the bottom.[13]  Plaintiffs contend that the resulting groove, which accounts for about fifty

---

[11] Dr. Jones claimed that such slots were located on the underside of samples E-522 and E-603.  The Court reviewed these samples and notes that the depressions Dr. Jones describes were both visually and tactilely indiscernible.  Depressions of the kind Jones describes were faintly discernible on the sample marked Def. Exib. 19 [DE 247 – 2], however, no reasonable juror could find that these depressions are sufficiently material in width and depth to be considered longitudinal slots.

[12] Dr. Jones's declaration was dated September 16, 2013, the same day Plaintiff filed its opposition and roughly one month after the agreed upon discovery cutoff date.  [DE 29, p. 2].  In his declaration Dr. Jones opines that cumulating the recesses present at the underside of the caulking line, or on the side edges, or between the caulking strip and plank across several joined planks or sheets accomplishes substantially the same result as the longitudinal slots of the patent.  [*See* DE 218-3, ¶13(ii), et. seq.]  Plaintiffs rely on these opinions to argue that the cumulated effect of these structures is equivalent to longitudinal slots. [DE 217, pp. 12 – 14].
 Within their reply brief, Defendants move to strike Dr. Jones's declaration based on non-compliance with Fed. R. Civ. P. 26.  [DE 226, pp. 3 -4].  Defendants correctly note that the purpose of Rule 26 disclosures is to prevent ambush.  *Rembrandt Vision Tech's, L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (11th Cir. 2013) ("The purpose of the expert disclosure rule is to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.") (internal quotation and citation omitted).  With discovery concluded and motions for summary judgment pending, Defendant did not have the opportunity to redepose Dr. Jones on the substance of his new opinions, consult its own expert to assist in determining the validity of the opinions, or marshal new rebuttal evidence.  To the extent that Plaintiffs claim that Dr. Jones could not have formed his equivalence opinions until Defendants disclosed additional product samples on August 22, 2013, the argument is unavailing.  Dr. Jones inspected samples with each of the four features described in his declaration in advance of his deposition, but did not offer any opinion on equivalence (save for microrecesses) until his declaration.  The measurements of the product samples made in the declaration, though not raised at Jones's deposition, are assumed objective and have been considered, as were any of Dr. Jones's opinions that Defendant had a fair opportunity to rebut.  [*See e.g.*, Note 8 *supra*].

[13] Plaintiffs claim that numbered samples E-521, E-522, E-600 Teak, E-602, E-603, E-605, and E-607 have this

percent (50%) of the plank's thickness and four and a half percent (4.5%) of the width of a six inch plank or nine (9%) of the width of a two inch plank, is a longitudinal slot. [DE 218-3, ¶13(iv)]. The contention overlooks the requirement that longitudinal slots be spaced relatively close to one another. By definition, the structure Plaintiffs argue is a slot is separated from the next closest structure by at least the entire non-edge part of the plank, which would account for 91% of the total distance of a 2 inch plank and 97% of the total distance of a 6 inch plank.[14] As such, a reasonable juror could not find these recesses are spaced "relatively close together."[15]

   *d. Recesses Between Caulking Line and Plank*

   Plaintiffs' final contention is that the space between the caulking line and body of the material of certain PlasTEAK products is a longitudinal slot.[16] [DE 218-3, ¶13(vii)]. Plaintiffs argument here fails for a combination of reasons its previous arguments do. First, the dimension of the slots is immaterial relative to the size of the plank. For example, Dr. Jones measures the width of one such groove to be two-

---

feature. [*See e.g.,* DE 196, p. 21].

[14] This calculation applies only to where the notched edge feature occurs on both longitudinal sides of the plank, which Plaintiffs call a T-Edged Plank. Where the T-Edge Plank feature occurs only on one side of the plank, as Plaintiff argues could be the case [DE 218-3, ¶13(v)], the distance between grooves would necessarily be greater.

[15] Plaintiffs also claim that when two planks with this edge feature are abutted, the distance between the "slots" is less than half an inch. However, the integral unit of the '881 patent's surface covering is the individual plank or sheet, as evidenced by the language of Claim 1 which states in relevant part: "the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and acting as a base for glue." As the 881 patent's file history confirms, the inventor intended for each plank to be enabled to be laid in tightly curved formations:

> "The inventor … greatly enhanced the degree of flexibility that would have been inherent to the material itself by adding a series of longitudinal slots and/or ribs in a very tight pattern on the underside of *the plank or sheet*. The addition of these longitudinal slots creates the ability of the *sheet or plank* to curve around tighter and tighter curves, where the mere inherent flexibility of material would only allow curvature over very slight or gradual curves." ["Declaration of Dr. C.K. Rhee, Ph.D." DE 77-4, p. 21] (emphasis added).

As such, the relevant dimension for the closeness of the slots is the distance between slots on the same plank or sheet, not the distance between a slot on one plank and the slot on its neighbor.

[16] Dr. Jones claims the "Metallic Series Gold with Black Lines" [DE 247-1], product E-521 [DE 196-2, p. 26], and another undesignated sample have this feature.

hundreds of an inch (0.02), or 1% of the sample's two-inch width.[17]  *Id.*   Like the recesses beneath the caulking strip described above, no reasonable juror could find a groove of this dimension material. Second, only one such groove is described as being present on the sample.  For the reasons discussed in note 14 *supra,*  the Court's definition of longitudinal slots implicitly requires more than one slot to be present on a single plank.  As such, even if the structure that Plaintiff has described met the materiality requirement, it fails to meet the plurality requirement.

### V.   SUMMARY JUDGMENT MUST BE GRANTED FOR DEFENDANTS ON FDUTPA CLAIM (CLAIM IV)

Plaintiffs allege that Defendants published deceptive statements on their website between February 2010 and February 2012 and that these statements ultimately caused Plaintiff to lower its prices to keep domestic distributor clients.[18]  Plaintiffs claim the publication violated FDUTPA, which makes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce..." unlawful. FLA. STAT. §501.204(1) (2011).  To state a FDUTPA claim, Plaintiffs must allege (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages. *Macias v. HBC of Fla. Inc.*, 694 So.2d 88, 90 (Fla. 3d DCA 1997).  Causation between the deceptive act or trade practice and the damages must be direct rather than remote or speculative. *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1361 (S.D. Fla. 2012).  Summary judgment on a FDUTPA claim is warranted where the record evidence fails to support the element of causation. *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013).

In 2010 Flexiteek had to reduce its prices to Original Equipment Manufacturers ("OEMs") and distributors leading to a loss of revenue.  [Declaration of Tom Jacques, DE 218-1, ¶¶ 8 - 9; Declaration of

---

[17] A picture of this groove taken with a scanning electron microscope is attached to Dr. Jones's declaration.  [218-3, p. 53].  The Court also inspected this sample and notes that it is imperceptible with the naked eye.

[18] The allegedly deceptive statements are as follows:  (1) omission of the fact that the January 29, 2010 PTO Office Action was preliminary and not final; (2) that Defendants did not infringe the '881 patent; (3) Plaintiffs are a massive, wealthy multinational corporation and are Goliath to Defendants' David; (4) Plaintiffs had expensive attorneys; (5) and that the removal of the injunction allowed Defendants to sell internationally.  [DE 217, p. 17 – 19].

Tomas Gustafsson, DE 218-2, ¶¶ 15 – 16 ]. Both Jacques, Flexiteek's U.S. subsidiary's CEO and Gustafson, the CEO of a Flexiteek subsidiary in Sweden, state that Plasteak's website posts caused Flexiteek's to lower its prices. The record contains several emails between Flexiteek's sales staff and its OEM's and distributors that confirm that Flexiteek did in fact cut its sales prices as to these distributors. However, this is no record evidence of communications between Flexiteek and a third party that mentions Plasteak's website, the Reexamination proceedings, the validity of the '881 patent, or the *Flexiteek I* litigation.[19] Aside from Jacques and Gustafson's conclusory statements, the record is devoid of causality evidence to support, even as a threshold matter, that Plasteak's statements caused Flexiteek's price cuts. Based on the record evidence, a reasonable juror could be no more likely to conclude that Plasteak's statements caused the Flexiteek's loss of revenue more than, for example, the general downturn in the economy, the entry of new market competitors, or technological advancements by a rival.

To defeat summary judgment there must be a sufficient showing that the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Here, the lack of record evidence on the causation element precludes such a showing. Plaintiffs have argued that a jury *could* infer causality based on the alleged deception and damages alone. [DE 217, p. 20]. However, Plaintiffs have cited neither a scintilla of actual evidence to support such an inference, nor any case law which would support the proposition that the direct causality element of a FDUTPA claim could be proven by inference alone. As such, because a jury could not find for Plaintiffs as a matter of law, summary judgment for Defendants is warranted.

**VI.    CONCLUSION**

For the foregoing reasons, it is

---

[19] Gustafson also states he had to correct Plasteak's statements to "preserve client relationships." As evidence, Plaintiff attached e-mails between Gustafson and a representative of a company called Nuteak. On September 13, 2011 the Nuteak representative wrote: "We were told that Plasdeck and Tek Dek will be out of the market and after 3 years, Plasdeck is still very active Tek Dek also in Canada. We were again told that your patent was revoked and the chance to be re-activated (sic.) were slim. Is that true?" [DE 218 – 1]. The Nuteak representative made no mention of Plasteak's website, did not identify the patent at issue, did not name his source, or explain how the questionable validity of the '881 patent would impact Nuteak. There is also no record evidence to suggest that Flexiteek cut its sales price to Nuteak. Gustafson replied to the Nuteak email with a statement from Flexiteek's lawyer stating that ultimately Flexiteek reached an "incredible result" in its dealings with the PTO. The attorney's statement never mentioned any comment Plasteak made or cited any posts from Plasteak's website. Id.

11

ORDERED THAT

(1) Defendants' Motion for Summary Judgment [DE 196] is **GRANTED**.  The Court

will separately enter Final Judgment for Defendants.

(2) All pending motions except Plaintiffs' Motion for Sanctions [DE 186] are **DENIED AS**

**MOOT.**

(3) The parties are directed to retrieve their product samples, and courtesy copies of

briefing, exhibits, and file histories from chambers by **December 4, 2013.**

(4) The **CASE IS CLOSED.**

DONE AND ORDERED in Miami, Florida, this ___ day of December 2013.

PATRICIA A. SEITZ<br>
UNITED STATES DISTRICT JUDGE

cc:   Honorable Andrea M. Simonton
       All counsel of record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60215-CIV-SEITZ/SIMONTON

FLEXITEEK AMERICAS, INC. and
FLEXITEEK INTERNATIONAL
AS,
                    Plaintiffs,
vs.

PLASTEAK, INC. and PLASDECK,
INC.,
                    Defendants.
_____/

## FINAL JUDGEMENT

THIS MATTER came before the Court upon Defendant's Motion for Summary Judgment. [DE 196]. In a previous order [DE 254] which set forth its reasoning, the Court granted final summary judgment to Defendants Plasteak, Inc. and Plasdeck, Inc. Accordingly, it is

ORDERED THAT

Final Judgment is entered in favor of Defendants Plasteak, Inc. and Plasdeck, Inc. and against Plaintiffs Flexiteek Americas, Inc. and Flexiteek International, AS., who shall recover nothing in this action.

DONE AND ORDERED in Miami, Florida this _3rd_ of December, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Honorable Andrea M. Simonton
    All counsel of record

1

CASE PARTICIPANTS ONLY

**Exh. A**
**(copy of the '881 Patent)**

Case 0:12-cv-60215-WJZ   Document 1-3   Entered on FLSD Docket 02/06/2012   Page 2 of 11



### The Director of the United States Patent and Trademark Office

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

### United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America for the term set forth below, subject to the payment of maintenance fees as provided by law.*

*If this application was filed prior to June 8, 1995, the term of this patent is the longer of seventeen years from the date of grant of this patent or twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

*If this application was filed on or after June 8, 1995, the term of this patent is twenty years from the U.S. filing date, subject to any statutory extension. If the application contains a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121 or 365(c), the term of the patent is twenty years from the date on which the earliest application was filed, subject to any statutory extensions.*

Director of the United States Patent and Trademark Office

**A111**

Case 0:12-cv-60215-WJZ   Document 1-3   Entered on FLSD Docket 02/06/2012   Page 3 of 11

## NOTICE

*If the application for this patent was filed on or after December 12, 1980, maintenance fees are due three years and six months, seven years and six months, and eleven years and six months after the date of this grant, or within a grace period of six months thereafter upon payment of a surcharge as provided by law. The amount, number of timing of the maintenance fees required may be changed by law or regulation. Unless payment of the applicable maintenance fee is received in the United States Patent and Trademark Office on or before the date the fee is due or within a grace period of six months thereafter, the patent will expire as of the end of such grace period.*

**A112**

(12) **United States Patent**
Whitaker

(10) Patent No.: **US 6,895,881 B1**
(45) Date of Patent: **May 24, 2005**

(54) **SHAPE CONFORMING SURFACE COVERING**

(76) Inventor: **Derek Gordon Whitaker**, 29 Welwick Road, Patrington, East Yorkshire, HU12 Orp (GB)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 13 days.

(21) Appl. No.: **10/018,316**

(22) PCT Filed: **Jun. 19, 2000**
(Under 37 CFR 1.47)

(86) PCT No.: **PCT/SE00/01302**

§ 371 (c)(1),
(2), (4) Date: **Aug. 5, 2003**

(87) PCT Pub. No.: **WO01/00948**

PCT Pub. Date: **Jan. 4, 2001**

(30)        **Foreign Application Priority Data**

Jun. 24, 1999   (GB) ..................................... 9914848
Oct. 8, 1999    (GB) ..................................... 9923690

(51) Int. Cl.$^7$ ................................................. **B63B 5/08**

(52) U.S. Cl. ..................... 114/85; 52/309.16; 52/592.1; 114/357

(58) Field of Search ............................. 114/82, 84, 85, 114/86, 88, 357, 358; 52/578, 590.2, 591.2, 52/592.2, 592.6, 582.1, 586.1, 589.1, 592.1, 52/309.16, 177

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 491,417 A * | 2/1893 | Fincher ........................ | 114/86 |
| 1,737,589 A * | 12/1929 | Jaspert ................... | 52/396.04 |
| 2,250,482 A * | 7/1941 | Harshberger ............... | 428/168 |
| 2,252,430 A * | 8/1941 | Arthur ........................ | 52/578 |
| 3,593,479 A * | 7/1971 | Hinds et al. ................. | 52/313 |
| 4,141,944 A * | 2/1979 | Anstadt et al. ........... | 264/45.5 |
| 4,453,357 A * | 6/1984 | Zwilgmeyer ........... | 52/309.8 |
| 5,207,172 A | 5/1993 | Wolter | |
| 6,295,777 B1 * | 10/2001 | Hunter et al. ................. | 52/519 |

FOREIGN PATENT DOCUMENTS

GB    2000471 A    1/1979

* cited by examiner

*Primary Examiner*—Sherman Basinger
(74) *Attorney, Agent, or Firm*—Birch, Stewart, Kolasch & Birch, LLP

(57)                    **ABSTRACT**

A shape conforming surface covering useful for covering any type of surfaces, and comprising planks (**1, 2**) or sheet of a plastic or flexible material adapted to be interconnected aside of each other thereby forming an assembled surface covering of optional length and width, and which planks (**1, 2**) or sheet are of a material that can be brought to curved formations, and which at the upper surface of the covering is roughened, for instance sanded or filed so as to imitate any unique grain effect of wooden material. Preferably the planks (**1, 2**) or sheet are formed with connection means (**4, 5**) at the longitudinal edges thereof. The surface covering may be an assembled unit comprising planks (**1, 2**) and caulking elements (**3**) between each pair of planks.

**1 Claim, 4 Drawing Sheets**



Case 0:12-cv-60215-WJZ Document 1-3 Entered on FLSD Docket 02/06/2012 Page 5 of 11



Fig. 1

Fig. 2

Fig. 3

Fig. 4

Case: 14-1214 Case: PARTICIPANTS ONLY Document: 75 39 Filed: 05/20/2014 Page: 75 of 11 Filed: 05/20/2014

Case 0:12-cv-60215-WJZ   Document 1-3   Entered on FLSD Docket 02/06/2012   Page 6 of 11



*Fig. 6*

*Fig. 7*

*Fig. 8*

*Fig. 9*

Case 0:12-cv-60215-WJZ    Document 1-3    Entered on FLSD Docket 02/06/2012    Page 7 of 11



Fig.5a

Fig.5b

Fig.5c

Fig.5d

Fig.5e

Fig.5f

Fig.5g

Fig.5h

Fig.5i

Fig.5j

Fig.5k

Case 0:12-cv-60215-WJZ   Document 1-3   Entered on FLSD Docket 02/06/2012   Page 8 of 11



*Fig. 10*



*Fig. 11*

**1**

# SHAPE CONFORMING SURFACE COVERING

This application is the national phase under 35 U.S.C. § 371 of PCT International Application No. PCT/SE00/01302 which has an International filing date of Jun. 19, 2000, which designated the United States of America and was published in English.

## FIELD OF THE INVENTION

The present invention relates to a shape conforming surface covering useful for covering a floor surface, a wall surface, a boat or yacht deck, floor boards in boats and yachts, bath and shower room floors and walls coverings, swimming pool surroundings, curved floor plans inside and outside buildings, claddings and coverings of many other types of surface recipients, including decoration. The surface covering according to the invention is formed by strips of an flexible material and is adapted for being laid in slightly curved formation where necessary, and it is generally intended to imitate a type of deck made by teak, mahogany, oregon pine etc. and which is sometimes formed with narrow seams by a rubber type material, which is normally of a contrasting colour, often black.

## BACKGROUND OF THE INVENTION

There are in use many surface coverings, many of which are made of straight planks with a version of the present invention easily being usable. Some applications, however, require conformity to curved shapes of the covering base. A typical example is teak planked deck of a yacht. Such surfaces have to be of a good, non slip character, and have to be at least fairly unaffected by water and have to look attractive. Wood, such as teak has been used for many years, but such wooden material is in many ways impractical and of relatively short lifespan. Curved wooden surfaces necessitate considerable stressing, preparation like adapting of the wooden ribs to any curved surface, fixing by screws, use of sealing compound and regular maintenance, especially scrubbing, oiling and varnishing and the use of pollutant, cleaning chemicals on a regular basis and in large amounts on boat, in particular these chemicals drain into the surrounding water. Curved wooden ribs or planks also involve an inherent spring stress requiring a strong fixation, generally using screws or bolts. Further, the new look of a teak deck is lost within weeks, and the whole deck requires major work or replacement in four to sex six years on average.

## SUMMARY OF THE INVENTION

Ecologically this invention does not require the cutting down of trees and is recyclable. The invention can take the place of tropical hardwoods used throughout the world in many applications.

The present invention is adapted to suggest a shape conforming surface covering comprising lengths of ribs of mostly the same cross section, but with differing cross sections included within the surface or at its edges or ends as required, of specifically shaped plastic material, which plastic ribs are of such flexibility that then can be made to follow at least slightly curved surfaces, tight curves being attainable with the use of heat. The lengths of ribs are adapted to be connected edge to edge in various combinations to form collectively the required size and shape of the surface to be covered. A variation of the invention can be

**2**

produced with the same material and finish in other cross sections to used for the edges of steps for example, or other functional or decorative applications. Normally a jointing compound must be used on wooden decks, but according to the invention the individual planks or caulking strips are malleable, becoming more and more malleable at increasing temperatures. According to the present invention the need for these "later applied" compound along the joints is no longer necessary. The new shapes or curves taken up by the planks or caulking strips become a relatively stress free feature of these planks or caulking strips unless re-adjustment is necessary, whereby re-adjustment can be made by applying heat to the strips, for instance using a hot air gun, hot water, radiant heat etc.

The planks and strips preferably are formed by extrusion of a plastic material and with matching locking means along the longitudinal edges thereof, preferably groove and tenon means. The planks likewise can be formed with narrow strips of a different coulour imitating seams of the type used in applying wooden deck on a yacht. The colours of the described planks and strips can easily be changed in the manufacturing extrusion process.

The surface covering is assembled, complete or in sections, is fixed to the recipient surface by means of an adhesive, and to this end the planks and strips preferably are formed with a suitable bottom surface facilitating the fixing of the covering. There is no need for using screws or bolts and associated holes because captive springing is not a problem as is normally the case with wooden planking made to conform with a curvature.

The surface covering according to the invention can be subjected various mechanical an manual abrasive techniques for specifically forming the surface of the plastic material such as sanding under specific conditions to provide a surface effect which is extremely similar to that of grained wood both in texture and appearance.

The surface covering according to the invention is advantegous in several respects over ordinary wooden coverings of similar types:

it is completely waterproof; it is easily washable to look new every time, even jet washable what is not possible for ordinary wooden coverings since jet washing is damaging the wood grain; it is extremely non slip, it is extremely stain resistant; it is easy to assemble; it can easily be laid in curvature; it can easily be shaped using heat; there is no need for using nails, screws or bolts for fixing same to the recipient; it is throughout a solid or an integral material which can be sanded repeatedly upon need.

## BRIEF DESCRIPTION OF THE DRAWINGS

Now the invention is to be described in detail by way of examples and with reference to the accompanying drawings, in which:

FIG. 1 is a fragmentary perspective view of two plank sections with an intermediate caulking strip;

FIG. 2 shows a similar assembled surface with caulking strips in place between the planks;

FIG. 3 is a section showing a planking assuming a curved shape, and

FIG. 4 shows an assembled surface in a curved format;

FIGS. 5a, b, c, d, e, f, g, h, i, and j show cross section examples of methods that can be used to incorporating caulking strips into the surface, FIG. 5k (1, 2, 3, 4) shows examples of profiles to complete requirement for edgings,

US 6,895,881 B1

3

cutting out of shapes etc. to comprises a 'system' or compendium of shapes and profiles;

FIG. 6 illustrates various examples of under-surface cross sections;

FIG. 7 illustrates a belt sanding operation;

FIG. 8 illustrates an alternative texturing technique;

FIG. 9 shows an alternative abrasive tool 14a that can be used to produce the wood grain effect surface;

FIG. 10 illustrates an assembled curved section of a surface in plan view;

FIG. 11 illustrates a way of laying the surface.

## DETAILED DESCRIPTION

FIG. 1 shows a surface covering comprising planks 1 and 2 with an intermediate caulking strip 3 between each pair of planks. In the illustrated case the planks 1, 2 are formed with male connection means 4 along one longitudinal edge and female connection means 5 along the opposite longitudinal edge. The caulking strips are formed with equivalent male and female connection means arranged so that a set of planks 1, 2 and intermediate caulking strips 3 provide an integral unit. Adhesive being used in the joint if necessary. Any number of planks 1, 2 can be connected to each other, both with and without intermediate caulking strips 3. The underside of the plank can be formed with a number of recesses 6, which both facilitate a curving of the plank, as illustrated in FIG. 3, and form a connection means for glue or a similar material by means of which the surface covering is glue connected to surface covering recipient 7, as illustrated 11.

In a version of the invention a sheet would be extruded without the caulking strips with the caulking strips coextruded integral, or with facility to incorporate applied caulking strips.

Both the planks and the caulking strips can be made with different colours, imitating wood like teak, mahogany, pine, oregon pine, redwood, etc. For example, the planks may have a colour and lustre imitating the colour and grain structure of a wooden material. The caulking strips preferably are made of another colour than the planks, for instance a black colour imitating the rubber material seams in seamed decks of yachts. It also retains its colour far better than its' natural wood alternative. Moreover, the planks may be made of a plastic or resin material, such as PVC for example, that may include additives for providing UV protection, fire retardants, and natural or synthetic fibres. The planks may be formed with streaks of lines of colour included in the extrusion to further imitate the grain in wood. The planks may be used as a floor surface, a wall surface a boat or yacht deck, floor board in boats and yachts, bath and shower room floors and walls covering, swimming pool surroundings, curved floor planks inside and outside buildings, claddings and covering of many other types of surfaces. The planks may also be partly filled with a rigid material.

FIG. 6 illustrates different types of useful under side surface profiles. The cross sections of the various profiles can also include provision for insertion of rigid or injected foam of lighter material to reduce the overall weight, and/or for insulating purposes. The planks 1 and 2 and the caulking strips 3, including the male and female connection means 4, 5 and under surface recesses 6 can be formed in endless lengths by any known process, like injection press extrusion of press moulding. The planks 1 and 2 preferably are formed by a plastic material which is stiff enough for keeping the planks and caulkings together as an integral unit, but which can still be formed in a curvature adapted to the curvature of the recipient 7. Planks can be joined in the longitudinal

4

direction as shown with planks 8 and 9 an cross extending caulking strip 10 in FIG. 2. The planks can be formed in a curvature preferably using heat from a hot air gun or a hair dryer 11, as indicated in FIG. 3. FIG. 4 fragmentarily shows a curved surface covering consisting of three planks and intermediate caulking strips.

The planks and the caulking strips can be arranged for interconnection in several ways. In FIGS. 5a and 5e is shown that the planks and the caulking strips have straight side edges and are adapted to be connected by glue or by a welding process; FIGS. 5b, c, and f illustrate interconnection of the planks and the caulking strips by means of male and female connection means, and FIG. 5d illustrates an interconnection using overlapping portions of the planks and the caulking strips. FIG. 5f illustrates that the planks 12 can be co-extruded with a caulking strip 13, whereby, in the illustrated case, the caulking strip 13 is formed with male connection means 4 and the plank 12 is formed with female connection means 5. FIG. 5g shows a co-extruded plank and caulking strip with the male connection means in the caulking strip; FIG. 5h shows an equivalent co-extrusion in which the caulking strip is formed with female connection means. FIG. 5i shows an example of how the upper surface joining profile enables a locking process to take place where the edges are prevented from lifting when the product is assembled, with or without the caulking part of the co-extrusion being under compression upon joining. The male and female connection means are provided in the plank parts, and a caulking strip is applied as a narrow strip on top of a part of the male connection means. FIG. 5j shows an embodiment where a section of the plank or of the profiles used in particular applications is filled with foam of a light weight material. Other examples of profiles with or without foam filling to requirements for edgings, cutting out of shapes etc. to comprises a system or compendium of shapes and profiles are shown in FIG. 5k (1, 2, 3, 4).

In any of the examples the caulking strip could be a softer material than that of the plank to come under compression, captive or otherwise when the product is assembled

FIG. 6 shows a cross section of an extruded plank, in which there are shown, for illustrative purposes, several types of bottom surface recesses.

For giving the planks, and the caulking strips a configuration similar to that of wood, the planks are, according to the invention, sanded, for instance using a belt sander 14 as shown in FIG. 7. The belt sander is brought to attack the plank, specifically using the curved or roller part of the sanding belt, in an angle of for instance 45° and is moved along the plank in direction shown with the arrow. A rotary wire brush can also be used in specific conditions to produce a desired effect, in required. At the same time as giving the planks a wooden like surface structure said sanding makes the upper surface of the surface covering an extremely non slip structure. The sanding operation can be repeated a great many times, even in the laid surface covering.

FIG. 8 shows an alternative type of sanding the planks, whereby the belt sander acts at an angle of about 60° to the longitudinal direction of the planks. Said angular strokes across the surface will produce individual effects using a powerfile 15.

FIG. 9 shows diagrammatically how an abrasive rotary tool can be used to produce the wood grain effect on the upper surface of the plank. By changing certain certain conditions various effects can be obtained like the meeting angle 16 in FIG. 7, the speed of rotation in FIG. 9, the coarsness of grit, the direction of stroke 17, which condi-

A119

5

tions are of importance to react with the formulation of the plastic surface to produce the unique grain effect.

FIG. 10 shows an example of use of a piece of surface covering or a curved border type plank mounted in contact with another cross extending border plank, like a plank sheer of a yacht.

The assembled surface covering material 18 is glued at the bottom side thereof and laid as shown in FIG. 11 by rolling the back of the covering material onto the recepient surface 19. Cutting and trimming of the surface covering is readily achieved, for instance with the use of a sharp knife.

## REFERENCE NUMERALS

1 plank
2 plank
3 caulking strip
4 male connection means
5 female connection means
6 recess
7 recipient
8 plank
9 plank
10 cross caulking strip
11 hot air gun, hair dryer

6

14 belt sander
14a abrasive tool
15 powerfile
16 angle
17 direction of stroke
18 covering material
19 recipient surface

What is claimed is:

1. A shape conforming surface covering useful for covering any type of surfaces, characterized in that the surface covering comprises planks or sheet of a flexible material adapted to be interconnected aside of each other thereby forming an assembled surface covering of optional length and width, and which planks are of a material that can be laid in curved formations, and which at the upper surface of the covering is roughened so as to imitate any unique grain effect of wooden material, further characterized in that the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient.

* * * * *

Case 0:12-cv-60215-WJZ   Document 1-7   Entered on FLSD Docket 02/06/2012   Page 1 of 5

**Exh. E**
**(copy of the Reexamined '881 Patent)**



US006895881C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8731st)

# United States Patent
Whitaker

(10) **Number:** US 6,895,881 C1
(45) **Certificate Issued:** Dec. 6, 2011

(54) **SHAPE CONFORMING SURFACE COVERING**

(75) Inventor: **Derek Gordon Whitaker**, Patrington (GB)

(73) Assignee: **Flexiteek International AS**, Oslo (NO)

**Reexamination Request:**
No. 90/009,533, Aug. 26, 2009

**Reexamination Certificate for:**
Patent No.: **6,895,881**
Issued: **May 24, 2005**
Appl. No.: **10/018,316**
Filed: **Aug. 5, 2003**

(22) PCT Filed: **Jun. 19, 2000**

(86) PCT No.: **PCT/SE00/01302**

§ 371 (c)(1),
(2), (4) Date: **Aug. 5, 2003**

(87) PCT Pub. No.: **WO01/00948**

PCT Pub. Date: **Jan. 4, 2001**

(30) **Foreign Application Priority Data**

Jun. 24, 1999 (GB) ............................................. 9914848
Oct. 8, 1999 (GB) ............................................. 9923690

(51) **Int. Cl.**
*B63B 5/00* (2006.01)
*B63B 5/08* (2006.01)
*E04F 15/10* (2006.01)
*E04F 15/02* (2006.01)
*E04F 13/08* (2006.01)
*E04F 13/18* (2006.01)

(52) **U.S. Cl.** ...................... **114/85**; 114/357; 52/309.16; 52/592.1

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,533, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Peter C. English

(57) **ABSTRACT**

A shape conforming surface covering useful for covering any type of surfaces, and comprising planks (1, 2) or sheet of a plastic or flexible material adapted to be interconnected aside of each other thereby forming an assembled surface covering of optional length and width, and which planks (1, 2) or sheet are of a material that can be brought to curved formations, and which at the upper surface of the covering is roughened, for instance sanded or filed so as to imitate any unique grain effect of wooden material. Preferably the planks (1, 2) or sheet are formed with connection means (4, 5) at the longitudinal edges thereof. The surface covering may be an assembled unit comprising planks (1, 2) and caulking elements (3) between each pair of planks.





US 6,895,881 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claim 1 is cancelled.

New claims 2-29 are added and determined to be patent-
able.

2. *The shape conforming surface covering of claim 1,
wherein the planks or sheet are mounted on the surface
recipient in a tightly curved formation only with adhesive
and without use of additional fasteners.*

3. *The shape conforming surface covering of claim 1,
wherein the planks or sheet are formed with a plurality of
longitudinal slots at the underside thereof for facilitat-
ing forming of the curved coverings,
wherein the planks or sheet are formed with connection
means;
wherein the connection means includes intermediate
caulking strips;
wherein the planks or sheet are co-extruded with one of
the intermediate caulking strips,
wherein the planks or sheet co-extruded with the caulking
strip includes a male connection member formed on
one of the planks or sheet and the caulking strip, and a
female connection member formed on the other of the
planks or sheet and the caulking strip;
and the planks or sheet includes a grain appearance sur-
face and a color, and the caulking strips have a different
color.*

4. *The shape conforming surface covering of claim 3,
wherein the intermediate caulking strips have lower sur-
faces without longitudinal slots.*

5. *The shape conforming surface covering of claim 3,
wherein the surface covering is waterproof.*

6. *The shape conforming surface covering of claim 1,
wherein the planks or sheet are formed with interconnec-
tors so that the planks or sheet are to be interconnected
aside of each other along longitudinal edges of the
planks or sheet,
wherein the interconnectors include intermediate caulk-
ing strips, and
wherein the planks or sheet are co-extruded with one of
the intermediate caulking strips, and the planks or
sheet includes a grain appearance surface and a color,
and the caulking strips have a different color.*

7. *The shape conforming surface covering of claim 1,
wherein the planks or sheet are formed with a plurality of
longitudinal slots at the underside thereof for facilitat-
ing forming of the curved coverings,
wherein the planks or sheet are formed with interconnec-
tors so that the planks or sheet are to be interconnected*

**2**

*aside of each other along longitudinal edges of the
planks or sheet,
wherein the interconnectors include intermediate caulk-
ing strips so that a set of one of the planks or sheet and
one of the intermediate caulking strips form an integral
unit, and
wherein the planks or sheet are co-extruded with one of
the intermediate caulking strips, and the planks or
sheet have a grain appearance surface.*

8. *The shape conforming surface covering of claim 1,
wherein the planks or sheet are formed with caulking
strips welded along one side, to form an integral unit,
and
wherein the surface covering is waterproof.*

9. *A shape conforming surface covering useful for cover-
ing any type of surfaces, characterized in that the surface
covering comprises planks or sheet of flexible material
adapted to be interconnected aside of each other thereby
forming an assembled surface covering of optional length
and width, and which planks are of a material that can be
laid in curved formations, and which at the upper surface of
the covering is roughened so as to imitate any unique grain
effect of wooden material, further characterized in that the
planks or sheet are formed with longitudinal slots at the
underside thereof for facilitating forming of curved cover-
ings and for acting as a base for a glue or adhesive material
by means of which the surface covering is mounted on a
surface recipient,
wherein the planks or sheet are capable of being laid in
tightly curved formations only with adhesive, and with-
out use of additional fasteners; and
wherein the planks or sheet are co-extruded with a respec-
tive intermediate caulking strip to form an integral unit.*

10. *The shape conforming surface covering of claim 9,
wherein each intermediate caulking strip has a lower sur-
face without longitudinal slots.*

11. *The shape conforming surface covering of claim 9,
wherein the surface covering with the co-extruded planks or
sheet with the respective intermediate caulking strip is
waterproof.*

12. *A shape conforming surface covering useful for cover-
ing any type of surfaces, characterized in that the surface
covering comprises planks or sheet of flexible material
adapted to be interconnected aside of each other thereby
forming an assembled surface covering of optional length
and width, and which planks are of material that can be laid
in curved formations, and which at the upper surface of the
covering is roughened so as to imitate any unique grain
effect of wooden material, further characterized in that the
planks or sheet are formed with longitudinal slots at the
underside thereof facilitating forming of curved coverings
and for acting as a base for a glue or adhesive material by
means of which the surface covering is mounted on a surface
recipient,
wherein the planks or sheet are capable of being laid in
tightly curved formations only with adhesive, and with-
out use of additonal fasteners; and
wherein the planks or sheet are co-extruded with interme-
diate caulking strips, and the planks or sheet includes a
grain appearance surface and a color, and the caulking
strips have a different color.*

13. *The shape conforming surface covering of claim 12,
wherein each intermediate caulking strip has a lower sur-
face without longitudinal slots.*

14. *The shape conforming surface covering of claim 12,
wherein the surface covering is waterproof.*

Case: 14-1214 Case: 14-1214 PARTICIPANTS ONLY Document: 40 Document: 39 Page: 84 Filed: 05/20/2014 Page: 84 Filed: 05/20/2014

Case 0:12-cv-60215-WJZ   Document 1-7   Entered on FLSD Docket 02/06/2012   Page 4 of 5

US 6,895,881 C1

**3**

15. A shape conforming surface covering useful for covering any type of surfaces, characterized in that the surface covering comprises planks or sheet of flexible material adapted to be interconnected aside of each other thereby forming an assembled surface covering of optional length and width, and which planks are of a material that can be laid in curved formations, and which at the upper surface of the covering is roughened so as to imitate any unique grain effect of wooden material, further characterized in that the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient,

wherein the planks or sheet are mounted on the surface recipient in tightly curved formations only with adhesive, and without use of additional fasteners, and

wherein the surface covering is waterproof.

16. The shape conforming surface covering of claim 15, wherein the planks or sheet are co-extruded with intermediate caulking strips, and wherein the planks or sheet have a grain appearance surface.

17. The shape forming surface covering of claim 15, wherein the planks or sheet are co-extruded with intermediate caulking strips, and wherein the planks or sheet have one color and the intermediate caulking strips have a different color.

18. A shape conforming surface covering useful for covering a boat or yacht deck, characterized in that the surface covering comprises planks or sheet of flexible material adapted to be interconnected aside of each other thereby forming an assembled surface covering of optional length and width, and which planks are of a material that can be laid in curved formations, and which at the upper surface of the covering is roughened so as to imitate any unique grain effect of wooden material, further characterized in that the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient of a boat or yacht deck, and

wherein the planks or sheet are mounted on the surface recipient in tightly curved formations only with adhesive, and without use of additional fasteners.

19. The shape conforming surface covering of claim 18,

wherein the planks or sheet are formed with interconnectors so that the planks or sheet are to be interconnected aside of each other along longitudinal edges of the planks or sheet,

wherein the interconnectors include intermediate caulking strips so that a set of the planks or sheet and one of the intermediate caulking strips form an integral unit, and

wherein the planks or sheet are co-extruded with one of the intermediate caulking strips, and the planks or sheet have a grain appearance surface.

20. The shape conforming surface covering of claim 19, wherein the planks or sheet have one color and the intermediate caulking strips have a different color.

21. The shape conforming surface covering of claim 19, wherein the surface covering is waterproof.

22. A shape conforming surface covering useful for covering a boat or yacht deck, said surface covering being made of a flexible plastic or resin material that can be laid in curved formations having a color and luster imitating the grain effect of a wooden teak, mahogany, pine, Oregon pine,

**4**

or redwood, and which, at the upper surface of the covering, is roughened, so as to imitate any unique grain effect of wooden material, in which

the surface covering is made up by plank strips, that are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient, and

in which the plank strips are each co-extruded with a caulking strip to form an integral unit, and

in which the plank strips are of a color and luster imitating the color and grain structure of a wooden material, and the caulking strips are of a different color, characterized in

wherein each plank strip and co-extruded caulking strip includes a male connection member formed on one longitudinal side edge of the integral unit, and a female connection member formed on another longitudinal side edge of the integral unit.

23. The surface covering according to claim 22, characterized in that each integral unit is mateably attachable to another integral unit when matching the male connection member along one longitudinal side edge of the integral unit with the female connection member along an opposite longitudinal side edge of the another integral unit.

24. The surface covering according to claim 22, wherein the caulking strips have no longitudinal slots underneath.

25. The surface covering according to claim 22, wherein the surface covering is waterproof.

26. The surface covering according to claim 22, wherein each plank strip and each caulking strip is capable of being laid in a tightly curved formation, with each plank strip and each caulking strip being secured only with adhesive, without the use of additional fasteners.

27. A shape conforming surface covering useful for covering a boat or yacht deck, characterized in that the surface covering comprises planks or sheet of flexible material adapted to be interconnected aside of each other thereby forming an assembled surface covering of optional length and width, and which planks are of a material that can be laid in curved formations, and which at the upper surface of the covering is roughened so as to imitate any unique grain effect of wooden material, further characterized in that the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient,

wherein the planks or sheet are formed with a plurality of longitudinal slots at the underside thereof for facilitating forming of the curved coverings,

wherein the planks or sheet are formed with interconnectors so that the planks or sheet are to be interconnected aside of each other along longitudinal edges of the planks or sheet,

wherein the interconnectors include intermediate caulking strips so that a set of one of the planks or sheet and one of the intermediate caulking strips form an integral unit, and

wherein the planks or sheet are each co-extruded with one of the intermediate caulking strips, and the planks or

**A133**

US 6,895,881 C1

| 5 | 6 |
|---|---|

sheet have one color and the caulking strips have a different color.

28. The surface covering according to claim 27, wherein the planks or sheet are mounted on the surface recipient in a tightly curved formation only with adhesive, and without use of additional fasteners.

29. The shape conforming surface covering of claim 27, wherein the planks or sheet have a grain appearance surface.

\* \* \* \* \*

A134

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this <u>20th</u> day of May, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

By: <u>/Scott D. Smiley/</u>
Scott D. Smiley, Esquire
Florida Bar Number: 678341

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

FLEXITEEK AMERICAS, INC.
vs.
PLASTEAK, INC.

CASE NO. 14-1214

**SERVICE LIST**

Robert E. Pershes, Esq.
Florida Bar No. 301906
Roetzel & Andress, LPA
350 E. Las Olas Blvd., Suite 1150
Fort Lauderdale, Florida 33301
Telephone: (954) 462-4150
Facsimile: (954) 462-4260
Email: rpershes@ralaw.com; serve.rpershes@ralaw.com
*Attorney for Appellees PLASTEAK, INC. and PLASDECK, INC.*
Service via CM/ECF.

Ronald S. Kopp, Esq.
Ohio Bar No. 0004950
Roetzel & Andress, LPA
222 South Main Street, Suite 400
Akron, OH 44308
Telephone: (330) 849-6644
Email: rkopp@ralaw.com
*Attorney for Appellees PLASTEAK, INC. and PLASDECK, INC.*
Service via CM/ECF.

Vijay Gibran Brijbasi, Esq.
Florida Bar No. 15037
Roetzel & Andress, LPA
350 E. Las Olas Blvd., Suite 1150
Fort Lauderdale, Florida 33301
Telephone:  (954) 462-4150
Facsimile:  (954) 462-4260
Email: vbrijbasi@ralaw.com; serve.vbrijbasi@ralaw.com
*Attorney for Appellees PLASTEAK, INC. and PLASDECK, INC.*
Service via CM/ECF.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or FRAP 28.1(e).

☒ The brief contains [*__9245__*] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

• The brief uses a monospaced typeface and contains [*state the number*] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or FRAP 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ The brief has been prepared in a proportionally spaced typeface using [*__Microsoft Word 2013__ version*] in [*Size 14, Times New Roman style*], or

• The brief has been prepared in a monospaced typeface using [*name and version of word processing program* ] with [*of characters per inch and name of type style* ].

By: <u>Scott D. Smiley, Esq.</u>
Florida Bar No: 678341
ATTORNEYS FOR PLAINTIFFS-APPELLANTS

MAY 20, 2014